UNITED STATES of America,
et al., Plaintiffs,

v.

State of WASHINGTON,
et al., Defendants.

Civil No. 9213—Phase I.

United States District Court,
W.D. Washington.

COMPILATION OF MAJOR
POST–TRIAL SUBSTANTIVE ORDERS
(January 1, 1987 through December 31, 1990)

See appellate decisions, 901 F.2d 772, 935 F.2d 1059, 969 F.2d 752.

## TABLE OF CONTENTS

| ORDER | PAGE |
|---|---|
| Order re Service List (10/22/87) | 1128 |
| Decision and Order re United States' Motions for Partial Dismissal (7/29/88) | 1132 |
| Order Denying Motion to Disqualify (11/12/88) | 1136 |
| Order Adopting the Special Master's Report and Recommendation (2/25/89) | 1143 |
| Decision and Order re Tulalip Motion for Preliminary Injunction to Enjoin Lummi Fishing in Area 8A (3/13/89) | 1152 |
| Order re Tribal Motion for Attorney's Fees (2/15/90) | 1153 |
| Decision and Order re Cross–Motions for Summary Judgment (2/15/90) | 1155 |
| Order Denying Motion to Refer and Granting Motion for Approval and to Dismiss Subproceedings (5/3/90) | 1165 |
| Decision and Order re Eastern Boundary of Lummi Indian Reservation (5/26/90) | 1166 |
| Order Denying Quileute Tribe's Motion for Temporary Restraining Order (11/3/90) | 1171 |

COMPILATION OF MAJOR POST–TRIAL SUBSTANTIVE ORDERS

(Through December 31, 1986)

ORDER RE SERVICE LIST

(October 22, 1987)

ROBERT E. COYLE, District Judge.

In order to ensure that the Court, the clerk's office, the magistrate, the special master, if any, the court's advisor, counsel and all others entitled or required to be served receive all appropriate papers filed in Phase I of *United States v. Washington,* it is ordered that the following procedures be observed:

1. <u>Official Service List</u>. The Clerk of the Court is to maintain and keep an Official Service List, in the form attached hereto, which will include the following:

a. A Master Service List which will include the following:

i. The name, address and phone number of the judge, the magistrate, the special master, if any, the clerk, and the court advisor, who are to receive all filings.

ii. The name, address and phone number, and a designation of the party or parties being represented, of each plaintiff's counsel who is to receive all filings. This list should include all plaintiffs' counsel who have made general appearances for one or

more Tribes and the names of the Tribes represented.

iii. The name, address and phone number, and a designation of the party or parties being represented, of each defendant's counsel who is to receive all filings.

iv. The name, address and phone number, and a designation of the amicus or amici being represented, of each amicus' counsel who is to receive all filings.

v. The name, address and phone number of each other party, amicus or person who is to receive all filings.

vi. The name, address and phone number and, in the case of counsel, a designation of the party or parties being represented, of each counsel for any plaintiff, defendant, amicus or other party, and each other party, amicus or person who is to receive all initial filings.

b. Individual service lists by subproceeding number which will contain the following:

i. The name, address and phone number and, in the case of counsel, a designation of the party or parties being represented, of each counsel or other person, including any special master, and each other person or party who does not appear on the Master Service List and who is to receive all filings in that subproceeding.

ii. The name, address and phone number and, in the case of counsel, a designation of the party or parties being represented, of each counsel and each other party or person who is designated on the Master Service List as receiving initial pleadings only and who is to receive all fixings in that subproceeding.

iii. The name, address and phone number, and a designation of the party or parties being represented, of each counsel who appears on the Master Service List and who is representing a party or parties in that subproceeding in addition to the party or parties designated on the Master Service List.

Provided, that no individual service list need be maintained for any subproceeding in which service and representation of the parties are to be identical to that set forth on the Master Service List.

2. Additions and Revisions. Whenever there is any addition or revision to the Master Service List or the service list for any subproceeding, or a service list for a subproceeding where an individual service list was not previously required, as soon as possible, the Clerk of the Court shall distribute the revised Master Service, or the revised or new service list for the individual subproceeding, with the date of the new or revised service list shown thereon, to the courts the magistrate, the special master, if any, the court technical advisor, all counsel and any other party, amicus or person on the Official Service List, including all counsel and all parties, amici or persons on the Master Service List and the service lists for each individual subproceeding.

3. Appearances and Notices.

a. Whenever any counsel makes a general appearance, that counsel, shall be responsible for obtaining a current Official Service List and shall serve a written notice of appearance, by separate pleading, on the court, the magistrate, any special master, the court advisor, all counsel and other parties, amici or persons on the Master Service List and on all counsel and other parties or persons on each of the service lists for the individual subproceedings, and shall file the same with the Clerk.

b. Whenever any counsel who has made a general appearance, is substituted for by other counsel or associates with other counsel, or has a change of address, phone number or any other change, that counsel shall be responsible for serving written notice of the same, by separate pleading, on the court, the magistrate, any special master, the court advisor, all counsel and other parties, amici or persons on the Master Service List and on all counsel and other parties or persons on each of the service lists for the individual subproceedings, and shall file the same with the Clerk.

c. Whenever any counsel, who has not made a general appearance, makes an appearance for some limited purpose or subproceeding, that counsel shall be responsible for obtaining a current Official Service List and shall serve a written notice of appearance, by separate pleading, specifying the limited purpose or subproceeding for which the appearance is being made, on the court, the magistrate, any special master, the court advisor, all counsel and other parties, amici or persons on the Master Service List and on # 11 counsel and other parties, amici or persons on the Service list, if any, for the individual subproceeding for which an appearance is being made, and shall file the same with the Clerk.

d. Whenever any counsel, who has made a limited appearance, is substituted for by other counsel or associates with other counsel, or has a change of address, phone, number or any other change, that counsel shall be responsible for serving written notice of the same, by separate pleading, on the court, the magistrate, any special master, the court advisor, all counsel and other parties, amici or persons on the Master Service List and on all counsel and other parties, amici or persons on the service list, if any, for the individual subproceeding to which the notice applies, and shall file the same with the Clerk.

e. Whenever any authorized person other than counsel makes a general or limited appearance, is substituted by or associates-with another, or has a change of address, phone number or other change, such person shall serve and file like notice as is required of counsel in subparagraphs 3.a. through 3.d. of this Order.

4. Participation. All counsel or other authorized persons who have made either a general appearance or an appearance in a particular subproceeding may participate in that subproceeding at any stage of the litigation but such participation shall be governed by the schedules, orders and other arrangements in place in that subproceeding.

5. Certificate of Service. A Certificate of Service in substantially the form of this attached Certificate of Service shall be served with each pleading or other paper required to be served. It shall not be necessary for a copy of the Official Service List, or any portion thereof, showing upon whom service has been made to be served with the Certificate of Service; provided, that a copy of the Official Service List, or portion thereof, showing upon whom service has been made shall be filed with the original Certificate of Service filed with the clerk of the court.

6. Notice Re: Discovery. Any party or other authorized person serving interrogatories, requests for documents, requests for admissions, or answers and responses thereto, may serve a notice in substantially the form of the attached Notice Re: Discovery, (a) in the case of interrogatories and requests, upon persons other than the party to whom the interrogatories and requests are directed, and (b) in the case of answers and responses,

upon persons other than the party who propounded the interrogatories and requests, in lieu of service of such papers. The Notice Re: Discovery and the papers required in paragraph 5 of this order shall be filed with the clerk. Any party who has not been served with interrogatories and requests or answers and responses thereto, may request a copy of such papers. All such requests for copies shall be complied with within five days of service of the request.

7. Mailing of Orders, etc. Notwithstanding the other provisions of this order, the Clerk of the Court shall continue to mail copies of all orders, minute orders, docket sheets and materials relating to appeals to all counsel and to all other persons listed on the Official Service List, whether appearing generally or for a limited purpose or subproceeding.

8. Mailing of Reports and Recommendations. The magistrate and any special master shall mail copies of all reports and recommendations in accordance with paragraph 2 of this Order.

9. Amici. Notwithstanding the other provisions of this order; any person or entity which desires to participate in any subproceeding as amicus, including the amici named on the Master Service List, shall file a motion to appear as amicus in that subproceeding in conformity with the applicable court rules relating to motions, and pending the granting or denial of such motion, counsel for such person or entity need be served only with those filings specifically relating to the motion to appear as amicus, and the Clerk, magistrate, or any special master, as the caste may be, need only mail to counsel for such person or entity those orders, or reports and recommendations specifically relating to such motion.

10. Copy of Order. Upon any appearance of any counsel or other person or party not on the Official Service List attached hereto, the Clerk shall mail such party a copy of this order and a copy of the current Official Service List, if not previously requested and obtained by such person or party.

11. Effective Date. Effective immediately, the attached Official Service List dated September 14, 1987, shall be the Official Service List for Phase I of these proceedings, subject to subsequent changes pursuant to the terms of this order, and such Official Service List supercedes all other service lists.

## CERTIFICATE OF SERVICE

I hereby certify that I served, the documents listed below by personal service or by causing to have mailed a copy of same, postage prepaid, on (date), to the persons required to be served in this subproceeding whose names appear on the following service lists:

1. Master Service List, dated (date).

2. Subproceeding No. _____ Service List, dated (date).

The documents served are as follows:

1. Certificate of Service;

2.

3.

Dated: _____

_____
(Signature of Attorney)
Attorney at Law

## NOTICE RE: DISCOVERY

PLEASE TAKE NOTICE THAT the following interrogatories (requests for production) (requests for admissions)(answers and responses) were served upon (name of person), attorney for (name of party), on _____, 19 ___.

1.

2.

Any person requesting, a copy of the same should direct his or her request in writing to the undersigned.

Dated: _____

_____

(Signature of Attorney)
Attorney at Law

## DECISION AND ORDER RE UNITED STATES' MOTIONS FOR PARTIAL DISMISSAL

Subproceeding No. 86–5

(July 29, 1988)

The United States has moved pursuant to Rules 12(b)(1) and 12(b)(6), Federal Rules of Civil Procedure for dismissal of Subparagraphs 2(a)-(f) of the Makah and Tulalip Tribes' Cross Request for Determination, of Paragraphs A–E of the Point–No–Point Treaty Tribes' Cross Request for Determination, and of Paragraphs 1a and 1d of Part D of the Upper Skagit Tribe's Cross Request for Determination.

The portions of the respective Cross Requests for Determination objected to by the United States are essentially the same. Accordingly, the court sets forth only the disputed sections of the Cross Request for Determination of the Makah and Tulalip Tribes although the court intends its rulings herein to apply to each of the disputed provisions filed by the respective tribes. Paragraphs 2(a)-(f) of the Cross Request for Determination of the Makah and Tulalip Tribes request:

Pursuant to ¶ 25 of the Injunction of March 22, 1974, 384 F.Supp. at 413, 419 and by way of response and affirmative defense to the allegations and conclusion contained in the Southern Tribes' Request for Determination filed September 8, 1986, responding tribes hereby request as follows:

(a) That the court determine the legal principles and guidelines (and shares if necessary) for determination of the equitable apportionment of harvestable coho among all tribes having rights under the treaties which are the subject matter of this case, including but not limited to all other tribes which are parties to this litigation, including, specifically, the tribes of the Quinault Treaty Area (the Quinault, Quileute, and Hon Tribes) and the Yakima Indian Tribe.

(b) That the court determine the legal principles and guidelines (and shares if necessary) for determination of equitable apportionment of all other stocks and species passing through or bound for the usual and accustomed places of any treaty tribe party to this litigation, including but not limited to all stocks of salmon bound for Puget Sound waters and Washington coastal streams.

(c) That the court determine the legal principles and guidelines (and shares if necessary) of all salmon species and stocks passing through usual and accustomed places of tribes party to this litigation bound for the Columbia River system, including specifically the equitable shares of the Yakima Tribe in such stocks.

(d) That the court determine the legal principles and guidelines (and specific shares if necessary) to determine equitable apportionment of all salmon stocks harvested in terminal areas and rivers within the case area and within the Columbia River system.

(e) That the court determine the legal principles and guidelines for determination of proper escapement goals and enhancement activities (where such activities will significantly affect the harvest shares of any party tribe) with reference to all stocks of salmon bound for Puget Sound region of origin, Washington

coastal region of origin, and Columbia River system region of origin.

(f) That the court direct the United States as a party to this litigation to cooperate with and assist the tribes in achieving a negotiated settlement of allocation issues, if possible, and direct and enjoin the United States from taking any actions in domestic or international regulatory areas which will adversely affect intertribal allocation agreements and management plans which may be determined in this proceeding.

## A. Jurisdiction of Columbia River Runs.

■ The United States concedes that Columbia River origin fish are subject to this court's jurisdiction as they pass through the fishing places of the tribes parties to this case other than the Yakima Tribe. The United States objects to those provisions of the various counter or cross-requests for determination seeking to have this court assume jurisdiction to decree the comprehensive allocation of, and the governing principles for management and enhancement activities for, Columbia River runs for all entities claiming an entitlement to a share of those runs whether or not they are parties to this case.

By order filed March 4, 1971 the Confederated Tribes and Bands of the Yakima Indian Nation were granted leave to intervene as plaintiffs in *United States v. State of Washington* "to the limited extent of their asserted fishing rights in streams within the Puget Sound drainage system." The United States contends that the Yakima's limited intervention was to confirm their claim of right to fish the Cascade Mountain streams that drain westward into Puget Sound.

In *United States v. State of Washington,* 384 F.Supp. 312, 400 (W.D.Wash.1974), the subject matter jurisdiction of this action was limited as follows:

7. This case is limited to the claimed treaty-secured off-reservation fishing rights of the Plaintiff tribes as they apply to areas of the Western District of Washington within the watersheds of Puget Sound and the Olympic Peninsula north of Grays Harbor, and in the adjacent offshore waters which are within the jurisdiction of the State of Washington. The subject matter of this case is limited to the application of those rights to the anadromous fish which are in the waters described, including such fish as are native to other areas.

The court's jurisdiction was subsequently expanded to include Grays Harbor and its watershed. *United States v. State of Washington,* 459 F.Supp. 1020, 1097 (W.D.Wash.1978).

Relying upon these orders in *United States v. State of Washington,* the United States contends:

The Tulalip Tribes' Cross–Request subparagraph (a) at pp. 6–7 asks that the court 'determine the legal principles and guidelines (and shares if necessary) for [apportioning coho] among all tribes having rights under the treaties which are the subject matter of this case, including * * * specifically * * * the Yakima Indian Tribe.' The Yakima Tribe's only active coho fishery is an in-river fishery on Columbia River coho, a subject that is specifically outside court-imposed limitation on that tribe's intervention in this case.... That tribe has not been granted party status in this case to litigate its treaty rights with respect to the Columbia River runs, a subject which it was (and still is) already litigating in the United States District Court for Oregon. *United States v. Oregon, et al.,* No. 68–513. Other tribes not parties to this case also have rights

to those coho under treaty clauses virtually identical to the Yakima's treaty. Cross-request (b) seeks a similar determination for all other stocks and species 'bound for the usual and accustomed places of any treaty tribe party to this litigation * * *.' The Yakima Tribe is a party to this litigation but is subject to the above court-imposed limitation. The court should modify cross-requests (a) and (b) to exclude determination of the shares of the Yakima and any nonparty treaty tribe except as those tribes may voluntarily consent to participate in the mediation....

Cross-request (c) seeks a similar determination for all salmon species and stocks 'bound for the Columbia River system, including specifically the equitable shares of the Yakima Tribes in such stocks.' Our same objection applies to this cross-request and the court should delete the last 12 words of paragraph (c) and provide that the remaining portion does not extend to determinations affecting nonparties or apply to Columbia River fish caught outside the case area of this case. For the same reason the court should delete the last six words of Paragraph (d) referring to salmon stocks harvested 'within the Columbia River system.')

Cross-request (e) seeks determination of legal principles and guidelines 'for determination of proper escapement goals and enhancement activities * * * with reference to all stocks of salmon bound for * * * [the] Columbia River system region of origin.' This is completely beyond the jurisdiction of this court in this case and dismissal is required by Rule 12(b)(6) due to the inability to join indispensable parties. Such parties include, in addition to the Columbia Basin Indian Tribes, the States of Oregon and Idaho and the United States none of whom has consented to be sued in this case with respect to its Columbia Basin enhancement activities.

The tribes do not present any argument contravening the United States' specific jurisdictional objection. Rather, it is argued that inclusion of the Columbia River runs in this subproceeding will foster more practical and thorough intra-tribal allocation. Thus, is is contended:

Tribal ocean fisheries in the case area are often severely limited by the nature or status of Columbia River runs. The status of those runs is directly affected by actions of the Yakima Tribe over which the resquesting [sic] tribes have no control. Again, since this is essentially a closed system, the nature and status of Columbia River runs must be considered in determining an equitable apportionment of coho runs (or any other runs) bound for the south Sound. For example, a tribe might be willing to discuss a reduced share of south Sound coho in return for a greater share of Chinook salmon bound for the Columbia River. This is simply an example of the possible trade-offs and adjustments that might be made in determining an equitable apportionment.

Although understandable, this argument is beside the point. The United States' jurisdictional concerns set forth above are well taken. The assumption of jurisdiction by the court over the Columbia River runs will usurp the jurisdiction of another district court, expand this court's jurisdiction wholly beyond that contemplated when this action was instituted, and interfere with sovereign immunity.

Consequently, this aspect of the United States' motion to dismiss should be granted, the tribes being directed to amend their cross-requests for determination as set forth by the United States *supra*.

B. United States' Sovereign Immunity.

The United States moves to dismiss Subparagraph 2(f) on the ground that the court lacks subject matter jurisdiction to enter the order requested therein because the United States has not waived its sovereign immunity from suits or claims, whether cross or counter, directed against the United States or the activities of the United States by bringing *United States v. Washington* of which this subproceeding is a part.

The United States instituted this action in September, 1970 on its own behalf and as trustee for the various tribes against the State of Washington and others seeking declaratory judgment concerning off-reservation treaty right fishing within the case area by the tribes and for injunctive relief to provide enforcement of those fishing rights as judicially determined.

■ As a general rule, the United States does not waive its sovereign immunity by instituting the action in which a party asserts a claim for affirmative relief against the United States. *United States v. City of Los Angeles*, 595 F.2d 1386, 1389 (9th Cir.1979).

The responding tribes argue that this general rule does not apply to this action. In so arguing they refer the court to *United States v. State of Oregon*, 657 F.2d 1009, 1012–1016 (9th Cir.1981). There, the Ninth Circuit affirmed the issuance of a preliminary injunction virtually banning fishing by the Yakima Tribe which tribe had intervened as a party plaintiff. The Ninth Circuit held that the Yakima Tribe had waived its sovereign immunity by its intervention and its express consent to suit. The Ninth Circuit ruled at 1014–1016:

> Intervenors under Fed.R.Civ.P. 13(a)(2), such as the Yakima Tribe, enter the suit with the status of original parties and are fully bound by all future court or-
ders.... By successfully intervening, a party 'makes himself vulnerable to complete adjudication by the federal court of the issues in litigation between the intervener and the adverse party.'...

Here, the Tribe intervened to establish and protect its treaty fishing rights; a basic assumption of that action was that there would be fish to protect. Had the original decree found the species to be in jeopardy, and enjoined all parties from future fishing in order to conserve the species, the Yakimas could not have then claimed immunity from such an action. Otherwise, tribal immunity might be transformed into a rule that tribes may never lose a lawsuit.

The only difference here is the court retained post-judgment jurisdiction to modify its decree. Retention of jurisdiction is characteristic of equitable decrees.... As Mr. Justice Frankfurter stated, an equitable injunction is ' "permanent" only for the temporary period for which it may last.' ... To hold at this stage that tribal immunity blocks modification of an equitable decree would impermissibly violate a central tenet of equity jurisprudence, that of flexible decrees. By seeking equity, this Tribe assumed the risk that any equitable judgment secured could be modified if warranted by changed circumstances. By intervening, the Tribe assumed the risk that its position would not be accepted, and that the Tribe itself would be bound by an order it deemed adverse.

The Tribe argues, however, that *United States v. United States Fidelity & Guaranty Co.*, 309 U.S. 506, 60 S.Ct. 653, 84 L.Ed. 894 (1940) [USF & G] supports their position. In USF & G, the Court held that tribal immunity barred a compulsory counterclaim in excess of the original claim. *See also Chemehuevi Indian Tribe v. California State Bd. of*

*Equalization*, 492 F.Supp. 55, 57–59 (N.D.Cal.1979). The tribe analogizes the present injunction to the counterclaim in USF & G; it claims that, by entering the suit, it was entitled either to an injunction in its favor or no relief at all. It argues that an injunction against the tribe was not among the possibilities initially risked and hence this later injunction was more like the barred counterclaim in USF & G.

We think this misconceives the basic nature of the underlying action. The original action, by seeking a declaration of treaty fishing rights, sought to apportion the Columbia River anadromous fishery among competing sovereigns. It thus has been recognized as analogous to an equitable action in rem. *Washington v. Washington State Commercial Passenger Fishing Vessel Ass'n*, 443 U.S. 658, 690 n. 32, 99 S.Ct. 3055, 3078, 61 L.Ed.2d 823 (1979); *United States v. Washington*, 520 F.2d 676, 687 (9th Cir. 1975), *cert. denied*, 423 U.S. 1086, 96 S.Ct. 877, 47 L.Ed.2d 97 (1976); *United States v. Crookshanks*, 441 F.Supp. 268, 270 (D.Or.1977) (contempt proceeding for violation of decree at issue here). In such an action, 'a court possessed of the res in a proceeding in rem, such as one to apportion a fishery, may enjoin those who would interfere with that custody.' *Washington v. Washington Commercial and Passenger Fishing Vessel Ass'n*, 443 U.S. 658, 692 n. 32, 99 S.Ct. 3055, 3078, 61 L.Ed.2d 823 (1979).

The responding tribes argue that since the United States' sovereign immunity is coextensive with that of the tribes, the rule of *United States v. State of Oregon, supra,* is equally applicable to it.

The United States replies that the rule of *United States v. State of Oregon* is not applicable to the United States relative to the dispute at issue in this subproceeding. The issue in this subproceeding involves the allocation among the tribes of the treaty share determined in this action. The United States contends: "It is true that this court has asserted certain jurisdiction in this case over the res—the fish runs. But that jurisdiction is limited to determining the rights inter se of the state and tribal parties to this case within the scope of their authorized participation in the case."

The court is inclined to conclude pursuant to *United States v. State of Oregon* that the United States may have waived its sovereign immunity. However, the crossrequest for determination is too broad and too vague for the court to finally resolve the issue.

In any event, the court will not exercise its jurisdiction and compel the United States to cooperate and assist in the mediation process. The arguments presented by the United States against such an order are, in the court's opinion, persuasive and compelling. Moreover, the court will not "direct and enjoin the United States from taking any actions in domestic or international regulatory arenas which will adversely affect intertribal allocation arguments and management plans which may be determined in this proceeding" as part of any order in connection with this subproceeding. As the United States argues, questions of United States' compliance with other laws relative to any eventual resolution of the subproceeding is not an issue in this subproceeding.

ACCORDINGLY, the United States' motions for partial dismissal are granted as set forth herein.

## ORDER DENYING MOTION TO DISQUALIFY

Sub-proceeding No. 86–5

(November 12, 1988)

On Tuesday, October 11, 1988 the court heard by telephone conference call the Mo-

tion to Disqualify Mason D. Morisset and the firm of Pirtle, Morisset, Schlosser & Ayer filed by the Lummi Indian Tribe. The court orally denied the motion on the ground that while a conflict of interest exists, it has been waived. The purpose of this order is to memorialize the court's ruling and the reasons therefor.

By this motion the Lummi Indian Tribe moves to disqualify Mason D. Morisset and the firm of Pirtle, Morisset, Schlosser & Ayer, counsel for the Tulalip Tribes, from any further participation in Sub-proceeding No. 86–5. As grounds for this motion the Lummis assert an unwaivable conflict of interest between Mr. Morisset's former representation of the Lummis from 1970 to 1980 and his current representation of the Tulalips in this sub-proceeding. Specifically, the Lummis contend:

> The interests of the Tulalip Tribes in this subproceeding are now actually adverse to those of the Lummi Indian Tribe. This subproceeding concerns the rights of the Lummi Indian Tribe and of the Tulalip Tribes under the Treaty of Point Elliot, which is the heart of the matters for which the Lummi Indian Tribe initially employed Mr. Morisset and his firm.
>
> . . .
>
> In particular, Mr. Morisset and his firm successfully established usual and accustomed fishing places in Area 8A for the Lummi Indian Tribe; now he seeks to disestablish the Lummi's right to fish in this area.

1. Applicable Standards.

▮ The standards governing disqualification of an attorney and his firm are set forth in *Trone v. Smith*, 621 F.2d 994, 998–1000 (9th Cir.1980):

> The relevant test for disqualification is whether the former representation is 'substantially related' to the current representation.
>
> . . .
>
> [T]he underlying concern is the possibility, or appearance of the possibility, that the attorney may have received confidential information during the prior representation that would be relevant to the subsequent matter in which disqualification is sought. The test does not require the former client to show that actual confidences were disclosed. That inquiry would be improper as requiring the very disclosure the rule is intended to protect ... The inquiry is for this reason restricted to the scope of the representation engaged in by the attorney. It is the possibility of the breach of confidence, not the fact of the breach, that triggers disqualification.
>
> . . .
>
> ... The substantial relationship test does not require that the issues in the two representations be identical.
>
> The relationship is measured by the allegations in the complaint and by the nature of the evidence that would be helpful in establishing those allegations.

In *Trust Corp. of Montana v. Piper Aircraft Corp.*, 701 F.2d 85, 87 (9th Cir.1983), the Ninth Circuit recognized that disqualification on this ground is subject to waiver:

> Generally, when the district court finds a substantial relationship the attorney should be disqualified. However, the former client may expressly or impliedly waive his objection and consent to the adverse representation....
>
> It is well settled that a former client who is entitled to object to an attorney representing an opposing party on the ground of conflict of interest but who knowingly refrains from asserting it promptly is deemed to have waived that right.

However, the party seeking to avoid an otherwise proper disqualification has the burden of making a clear showing of the facts from which a finding of waiver may flow. *Paul E. Iacono Structural Engineer, Inc. v. Humphrey*, 722 F.2d 435, 443 (9th Cir.), *cert. denied sub nom. Construction & General Laborers Union Local 304 v. Paul E. Iacono Structural Engineer, Inc.*, 464 U.S. 851, 104 S.Ct. 162, 78 L.Ed.2d 148 (1983).[1]

### 2. Substantially Related.

The scope of the litigation in *United States v. State of Washington* is set forth in the Boldt decision at 384 F.Supp. 312 (W.D.Wash.1974). The action was prosecuted by the United States on its own behalf and as trustee for several Western Washington Indian Tribes and a number of intervenor tribes, one of which was the Lummis, against the State of Washington, the State Department of Fisheries, the State Game Commission and the Washington Reef Net Owners Association. The plaintiffs sought declaratory relief concerning off reservation treaty right fishing by the plaintiff tribes within that portion of the State of Washington west of the Cascade Mountains and north of the Columbia River drainage area, including the American portion of the Puget Sound watershed, the watersheds of the Olympic Peninsula north of the Grays Harbor watershed and the offshore waters adjacent to those areas. Plaintiffs further sought injunctive relief to provide enforcement of those fishing rights as they previously had been or were judicially determined in the action. *Id.* at 327–328. In the course of resolving this issue raised by the complaint, Judge Boldt explained:

> An *exclusive* right of fishing was reserved by the tribes within the area and boundary waters of their reservations, wherein tribal members might make their homes if they chose to do so. The tribes also reserved the _right_ to off reservation fishing 'at all usual and accustomed grounds and stations' and agreed that 'all citizens of the territory' might fish at the same places 'in common with' tribal members. The tribes and their members cannot rescind that agreement or limit non-Indian fishing pursuant to the agreement. However, off reservation fishing by other citizens and residents of the state is not a _right_ but merely a _privilege_ which may be granted, limited or withdrawn by the state as the interests of the state or the exercise of treaty fishing rights may require.

> The tribes reserved the right to fish at 'all usual and accustomed grounds and stations.' The words 'grounds' and 'stations' have substantially different meanings by dictionary definition and as deliberately intended by the authors of the treaty. 'Stations' indicates fixed locations such as the site of a fish weir or a fishing platform or some other narrowly limited area; 'grounds' indicates larger areas which may contain numerous stations and other unspecified locations which in the urgency of treaty negotiations could not then have been determined with specific precision and cannot now be so determined. 'Usual and accustomed,' being closely synonymous words, indicate the exclusion of unfamil-

---

**1.** In this motion the Lummis cite *American Protection Insurance Company v. MGM Grand Hotel–Las Vegas, Inc.*, 748 F.2d 1293, 1300 (9th Cir.1984) for the proposition that doubts are to be resolved in favor of disqualification.

However, this opinion was withdrawn and the appeals dismissed in *American Protection Insurance Company v. MGM Grand Hotel–Las Vegas, Inc.*, 765 F.2d 925 (9th Cir.1985). In fact, the opinion which the Lummis quote is not even reported in 748 F.2d.

iar locations and those used infrequently or at long intervals and extraordinary occasions. Therefore, the court finds and holds that every fishing location where members of a tribe customarily fished from time to time at and before treaty times, however distant from the then usual habitat of the tribe, and whether or not other tribes then also fished in the same waters, is a usual and accustomed ground or station at which the treaty tribe reserved, and its members presently have, the right to take fish.

*Id.* at 332. Judge Boldt then determined the usual and accustomed grounds of a number of specific tribes, including the Lummis. With respect to the Lummis, Judge Boldt held:

[T]he usual and accustomed fishing places of the Lummi Indians at treaty times included the marine areas of Northern Puget Sound from the Fraser River south to the present environs of Seattle, and particularly Bellingham Bay. Freshwater fisheries included the river drainage systems, especially the Nooksack, emptying into the bays from Boundary Bay south to Fidalgo Bay.

*Id.* at 360.

As Mr. Morisset so aptly puts it, *United States v. State of Washington* has taken on a life of its own since the Boldt decision, spawning numerous sub-proceedings to the main action, including Sub-proceeding No. 86-5. Sub-proceeding No. 86-5 is captioned "North–South Sound Treaty Allocation," and generally involves questions concerning the rights of various tribes, including the Lummis and the Tulalips, to fish in certain locations relative to each other. Resolution of Sub-proceeding No. 86-5 is currently being addressed by mediation.

 Mr. Morisset argues that his prior representation of the Lummis is not sub-stantially related to his representation of the Tulalips in Sub-proceeding No. 86-5:

In the 1970s, the Ziontz firm represented the Lummi Tribe (and worked as co-counsel with lawyers for many other tribes) to establish the general treaty fishing right for all tribes and to delineate in very general terms the extent of the tribes' usual and accustomed fishing places. The legal analysis and evidence supporting those claims, asserted against the State of Washington, have no relevance to an intertribal dispute with respect to the primary rights of one tribe as against another or with respect to equitable allocation principles. There was nothing in the original complaint and nothing in the original litigation that involved evidence or required investigation of the rights of one tribe against another in overlapping usual and accustomed areas. And there is nothing in the charges brought by the Tulalips here that questions or seeks to reopen the prior adjudication of the Lummis' usual and accustomed fishing places.

Mr. Morisset's disclaimer that the Tulalips do not seek to challenge Judge Boldt's determination of the Lummis' usual and accustomed fishing grounds is not supported by the record herein and appears to be a belated attempt to dilute the potential conflict of interest. In the Tulalip Memorandum in Support of Motion for Preliminary Injunction re Lummi Fishing in Area 8A received by the court on September 22, 1988, the Tulalips, in the course of arguing that serious questions are raised in the sub-proceeding, contended:

First is the question of whether the Lummi Tribes have usual and accustomed fishing places in Area 8A at all. Unlike more detailed findings which have become the norm in the later determinations as to usual and accustomed places, the finding concerning the Lum-

mi Tribe, like most of the original findings in Final Decision No. 1, is very brief and vague....

Whether such a general finding was intended to include an area somewhat removed from Seattle such as Port Gardner and Port Susan (current WDF Area 8A) is questionable.

In the court's opinion, the fact that Mr. Morisset made this argument establishes that the two representations are substantially related notwithstanding his subsequent disclaimer of intent.

### 3. Prejudice to Tulalips.

 Mr. Morisset argues that the court must consider the real prejudice to the non-moving party in disqualifying its attorney in resolving a motion to disqualify on the ground of conflict of interest arising out of a prior representation.

None of the cases cited in support of this argument are from the Ninth Circuit. However valid Mr. Morisset's concerns are about the prejudice to the Tulalips if he and his firm are disqualified from this subproceeding and the effect of such a ruling on the continued litigation of *United States v. State of Washington* and its related matters, the Ninth Circuit accords no weight to them in determining whether an attorney should be disqualified if the matters are substantially related. *See Trone v. Smith, supra* at 1002.

### 4. Waiver.

Mr. Morisset further argues that even if the court concludes that the two representations are substantially related, the Lummis have waived their rights to raise it.

 The Lummis respond that the conflict of interest in this subproceeding cannot be waived:

Mr. Morisset and his firm were general counsel for the Lummi Indian Tribe for over ten years. During this time, as shown by the multiplicity of actions listed on the bills attached to the Williams affidavit, the firm and its partners, and especially Mr. Morisset and Mr. Pirtle, were privy to every legal confidence of the Lummi Indian Tribe. There were constant conversations and meetings between the attorneys and Lummi leaders. Thousands of lawyer hours were expended on Lummi business. Now this res gestae of knowledge is to be used against the Lummi Indian Tribe. In the context of the purposes behind the Rules of Professional Conduct and the Canons of Ethics, and in the context of this subproceeding, this is a conflict of interest that cannot be waived.

In the absence, however, of any authority cited by the Lummis holding that the magnitude of the prior representation renders a conflict of interest non-waivable as a matter of law, the court does not find the Lummis' argument persuasive in the light of Ninth Circuit authority holding that a client may waive the conflict.

 The Lummis further argue that no waiver of the conflict of interest can be found in connection with this sub-proceeding because Rule 1.9(a), Rules of Professional Conduct, adopted effective September 1, 1985 in 104 Wn. 2d 1101 (1985), has not been shown to have been complied with. Rule 1.9(a) provides:

A lawyer who has formerly represented a client in a matter shall not thereafter:

(a) Represent another person in the same or a substantially related matter in which that person's interests are materially adverse to the interest of the former client unless the former client consents in writing after consultation and a full disclosure of the material facts....

The court concludes, however, that Rule 1.9(a) is not a rule precluding an implied waiver of the conflict of interest, but mere-

ly a rule setting forth a standard of professional conduct.

■ In so arguing that a waiver has occurred, Mr. Morisset avers in his declaration received by the court on October 5, 1988:

> 9. In September 1980 I filed a petition to review and redesignate the Tulalip Indian Tribes usual and accustomed places pursuant to Judge Boldt's order permitting revision of the usual and accustomed boundaries drawn in his 1975 [sic] order. The Tulalips asserted rights to usual and accustomed places as far north as [the] Canadian border, including the San Juan Islands where the Lummis also have adjudicated usual and accustomed places and including most other areas claimed by that tribe.

Mr. Morisset refers the court to the transcript of a hearing on May 19, 1982 in the sub-proceeding in *United States v. State of Washington* referred to in his declaration, apparently Sub-proceeding No. 80–1, involving among others Mr. Morisset on behalf of the Tulalips and Mr. Raas on behalf of the Lummis. The transcript states in pertinent part:

> THE COURT: All right, well, now, we still have Mr. Raas' possible objection to Mr. Morisset's representation of the Tulalips.
>
> MR. RAAS: Yes, Your Honor, that is correct. My clients have instructed me to challenge Mr. Morisset's firm's representation of the Tulalips in this matter, principally on the grounds that the firm represented the Lummi Tribe during the establishment of the Lummi usual and accustomed places through a number of proceedings to set those U and A places. The tribe believes that—
>
> THE COURT: Isn't it possible that the two of you could resolve this?
>
> MR. RAAS: I would certainly hope that we could endeavor to do that. I am not

confident of convincing my clients, but I would say that within three weeks that I would be able to file that motion if we can't work something out.

> THE COURT: Well, temporarily Mr. Morisset is still the counsel of record, and I will continue him in that role, and I think what I will do is reserve your right to oppose his representation, if you can set forth some area where the conflict would make it improper for him to continue in representing the Tulalips.
>
> MR. RAAS: That is fine, Your Honor....

Mr. Morisset further avers in his declaration:

> 11. Subsequent to Mr. Raas' announcement in open court, a full review of the matter was undertaken by the Ziontz firm. My partner Mr. Alvin Ziontz specifically reviewed the matter and the Lummi files in the office and transmitted them to Mr. Raas. A conference was held with Mr. Raas and he accepted the files on behalf of the Lummi Tribe. It was my understanding that the matter was settled.
>
> 12. Subsequent to the transmittal of files the Lummis did not file a motion to disqualify. The Lummi Tribe made no formal objections to continued representation of the Tulalips.
>
> 13. The Tulalip usual and accustomed litigation continued with the two tribes in an advisory position. The matter finally came on for trial in 1985. The Tulalips were able to settle their differences with all tribes except the Lummis. Thus, the trial pitted the Tulalips and the Lummis on opposite sides of the question raised by the Tulalip petition. The Lummis fully participated in that trial through their counsel Mr. Raas, put on witnesses, cross examined Tulalip witnesses, and filed briefs in opposition

to the Tulalip claim. Subsequently on appeal the Lummis filed briefs in opposition to the Tulalips claim. The Tulalips claim was finally upheld by the Ninth Circuit. 841 F.2d 317 (9th Cir.1988).

The Lummis respond that their waiver in Sub-proceeding No. 80–1 is limited to that sub-proceeding and cannot constitute an effective waiver of the conflict of interest at issue here in any other sub-proceeding commenced in *United States v. State of Washington.*

In so arguing, the Lummis urge the court to characterize each sub-proceeding filed in *United States v. State of Washington* as an entirely separate lawsuit from any other sub-proceeding.

The court cannot entirely agree with this characterization. Judge Craig's order filed May 22,1985 instituted the sub-proceeding numbering system in order to assist the court and the parties to *United States v. State of Washington* in the organization and administration of the main case. While Judge Craig indicates that each "distinct dispute" will be assigned a separate sub-proceeding number, it is clear that the distinct disputes are those arising within the ambit of the main case. From the court's own experience, at least during the fisheries, often the only distinction among disputes is the year in which they arise. Consequently, the court does not find the Lummis' separate lawsuit analysis persuasive in the context of this action.

Moreover, to the extent that it can be inferred from Mr. Kinley's declaration that September 16, 1988 was the first time the Lummis became aware that the Tulalips contested any right of the Lummis to fish in Area 8A, the record before the court in *United States v. State of Washington* belies the inference. Sub-proceeding No. 87–4 involved the Tulalips' request for an injunction enjoining the Lummi from au-

thorizing or engaging in steelhead fishing in Area 8A. Although the Tulalips' memorandum in support of the request was grounded upon the assertion that fishing by the Lummi in Area 8A would be in violation of the Order Adopting Steelhead Management Plan set forth at 459 F.Supp. 1020, 1118 (W.D.Wash.1978) and the Order Approving Mediation entered as Docket No. 10785 on September 21, 1987, the transcript of the hearings held on December 9 and 10, 1987 states in pertinent part:

> MR. MORISSET: The issues here are, essentially, two. That is, the participation in steelhead planning in developing a management plan and so on. And, secondly, the fishing by the Lummi tribe in Area 8A at all.

> The history on this is important. Area 8A is the front yard of the Tulalip tribe and, to a certain extent, the front yard, a little bit farther removed, to the Fillami [sic] tribe. The Lummis have never fished in this area and have not participated in the co-management with the State over the years over the development of the numbers relative to the steelhead fishery.

> THE COURT: Let's accept both of those to be a fact, Mr. Morisset. Does that mean that the Lummis have no rights to fish there if the management plan could be drawn up to allow them to fish or to set forth their rights?

> MR. MORISSET: Mr. Raas, in his brief, stated that the Lummis have an absolute right to fish in Area 8A. We want to make it clear that we do not agree and accept that statement at all. We don't believe that anyone has an absolute right to fish anywhere and, certainly, don't agree that the Lummis have an absolute right to fish in 8A.

In addition, the Tulalips on two other occasions sought injunction relief to preclude

the Lummis from fishing in Area 8A. *See* Sub-proceedings Nos. 86–10 and 87–2.

The Lummis argue that the other sub-proceedings in which the Tulalips challenged their right to fish in Area 8A cannot form the basis for a waiver of the conflict of interest because the sub-proceedings did not directly contest the Lummis' usual and accustomed rights. The court, however, cannot accept this argument. It is clear from the above-quoted transcript that the Tulalips challenged the absolute right of the Lummis to fish in Area 8A, an absolute right which can only arise if the area is within a tribe's usual and accustomed area.

Finally, the Lummis contend that a waiver of the conflict of interest cannot be found because the motion to disqualify was not interposed for the purpose of causing prejudicial delay, such as causing a continuance of a trial date. In so arguing the Lummis imply that cases finding a waiver would not have done so if the motions to disqualify had been more timely.

 While the court agrees that the timing of a motion to disqualify may be a relevant factor in determining waiver, the court cannot agree that the timing of the motion before the court is of no consequence. Frankly, it has been obvious to the court since the institution of Sub-proceeding No. 87–4 that the Tulalips challenged the legal right of the Lummis to fish in Area 8A. It is also clear that the Lummis recognized and disregarded the conflict of interest arising from Mr. Morisset's representation in 1980. However, it is not until the court is on the eve of attempting to resolve yet another injunctive action involving the Lummis' right to fish in Area 8A that the motion to disqualify is brought. More importantly, it is brought in the sub-proceeding instituted in 1986 to resolve by mediation the intra-tribal rights to fish. Knowing as the Lum-

mis did in 1980 of this conflict of interest and knowing that the Whole purpose of Sub-proceeding No. 86–5 is to resolve either by mediation or litigation, the court can only look upon the Lummis' motion to disqualify as a very belated attempt to gain a tactical advantage in this sub-proceeding.

Consequently, the Motion to Disqualify Mason D. Morisset and the firm of Pirtle, Morisset, Schlosser & Ayer is denied.

## ORDER ADOPTING THE SPECIAL MASTER'S REPORT AND RECOMMENDATION

Sub-proceeding No. 85–1

(February 25, 1989)

This court referred the above-referenced dispute to Special Master Robert E. Cooper on July 17, 1987. Special Master Cooper filed his Report and Recommended Findings of Fact and Conclusions of Law as the final adjudication of the Suquamish Tribe's request for determination on August 1, 1988.

The court has reviewed the Suquamish Tribe's objections to the Special Master's report and recommendation, the responses thereto by the United States, the Lummi Indian Tribe, the Tulalip Tribe, the Muckleshoot Indian Tribe, the transcript of the proceedings before the Special Master, the Muckleshoot Indian Tribe's Motion for Order Adopting the Special Master's Report, Findings of Fact and Conclusions of Law and For Judgment Pursuant to Fed. R.Civ.P. 54(b) and all other pertinent pleadings. On February 6, 1989 the court conducted a hearing with respect to the Suquamish Tribe's objections pursuant to Rule 53(e)(2), Federal Rules of Civil Procedure. Based on this review, it is ORDERED that:

(1) The Suquamish Tribe does not have the status of political successor-in-interest to the treaty-time Duwamish Tribe.

(2) This order constitutes a final judgment, there being no just reason for delay.

IT IS FURTHER ORDERED that this Court fully adopts the Report and Recommended Findings of Fact and Conclusions of Law of Special Master Robert E. Cooper filed on August 1, 1988. These Findings and Conclusions are as follows:

## FINDINGS OF FACT[2]

384. The Duwamish and Suquamish tribes, among 20 others, were parties to the Treaty of Point Elliott. 12 Stat. 927. When identifying tribes for purposes of treating with the Indians of western Washington, the United States, through Governor Stevens and the treaty commission, often grouped or consolidated small tribes or bands that had no formal political structure into larger tribal units that became the political entities with which the United States negotiated the treaties. *United States v. Washington,* 384 F.Supp. 312, 354–55 (W.D.Wash.1974), *aff'd,* 520 F.2d 676 (9th Cir.1975), *cert. denied,* 423 U.S. 1086, 96 S.Ct. 877, 47 L.Ed.2d 97 (1976), *reh'g denied,* 424 U.S. 978, 96 S.Ct. 1487, 47 L.Ed.2d 750 (1976); Tr. 27. The treaty signatory Duwamish Tribe was composed by the United States in 1855 to include smaller, autonomous bands or tribes situated on the east side of Puget Sound in the vicinity of Lake Washington, the Cedar and Black rivers, and the lower White River (now called the Duwamish) below its junction with the Green River. *United States v. Washington,* 476 F.Supp. 1101, 1104–1105 (W.D.Wash.1979), *aff'd,* 641 F.2d 1368 (9th Cir.1981), *cert. denied,* 454 U.S. 1143, 102 S.Ct. 1001, 71 L.Ed.2d 294 (1982); Ex. SU–SM–24, at 1–2; Tr. 26–27. Generally, the Duwamish Indians occupied the environs of present-day Seattle and Renton, although the term was sometimes used in a broader sense to refer to Indians occupying the Duwamish River drainage as a whole. The circumstances surrounding the negotiation of the treaties indicate that the United States intended the Duwamish Tribe to be an independent treaty party and to function as the tribal representative of the bands subsumed under the name Duwamish, thereby ensuring a complete cession of Indian-held lands in the Duwamish River drainage. Ex. USA 102, at 3–4, 22–23.

385. The freshwater usual and accustomed fishing places of the Duwamish Indians at treaty times included, but were not limited to, Lake Washington, Lake Union, Lake Sammamish, the Black and Cedar rivers, and the lower White (or Duwamish) River below its junction with the Green River. Tr. 76–77; Ex. USA 102, Appendix 1. All of these water bodies and courses are situated to the east of Puget Sound.

386. Seattle was identified as chief of the Duwamish and Suquamish tribes in the Treaty of Point Elliott. *See United States v. Washington,* 476 F.Supp. at 1104 (F.F. No. 13). Seattle's mother was Duwamish and his father was Suquamish, Ex. G–4, at 185; it is therefore likely that he had close connections with both tribes. The identification of Seattle as "Chief of the Duwamish and Suquamish" by the treaty commission does not signify that he in fact had political authority to govern the Duwamish people. Dr. Lane has stated that Seattle's title "did not reflect either realities of indigenous political organization nor the treaty commission's understanding of na-

2. The numbering of the findings and conclusions follows the sequential numbering previously adopted for permanent findings and conclusions in this case.

tive political organization." Ex. USA 102, at 23. *See Washington v. Washington Commercial Passenger Fishing Vessel Ass'n* ["*Fishing Vessel*"], 443 U.S. 658, 664 n. 5, 99 S.Ct. 3055, 61 L.Ed.2d 823 (1979); *United States v. Washington*, 520 F.2d 676, 682 (9th Cir.1975) (Stevens "selected 'chiefs' from each tribe with whom to bargain."); Tr. 31, 142–43; Ex. USA 20, at 8. Seattle's status as nominal chief of the Duwamish and Suquamish does not indicate that the United States intended to consolidate those two entities into one tribe by virtue of Seattle's dual capacity.

387. The treaty commission intended that the Duwamish Tribe would be placed temporarily on the Port Madison Reservation also sometimes referred to as Fort Kitsap), which is located on the Kitsap Peninsula on the west side of Puget Sound across from Seattle. The commission also originally intended that the Duwamish would later be removed with all other western Washington tribes to a general reservation at Tulalip, near the mouth of the Snohomish River. Ex. USA 102, at 2–3. The Port Madison Reservation was established pursuant to Article II of the Treaty of Point Elliott and was also intended to serve as a home for the Suquamish Indians, in whose territory it was situated. No separate reservation was established by the treaty for the Duwamish in their own territory on the east side of Puget Sound. There is no evidence that any action was taken by the United States concurrently with the negotiation of the treaty in 1855 to implement the general plan to relocate the Duwamish Indians to Port Madison.

388. During the fall of 1855, certain Indians situated in the upper reaches of the Duwamish River drainage, principally along the Green and White rivers, attacked white settlements in the area. Tr. 33–34. For the most part, the Duwamish

Indians were not among the combatants. However, to sequester them from the hostile Indians, the United States in the winter of 1855–56 relocated the Duwamish from their east side villages to Bainbridge Island on the west side of Puget Sound. This removal of the Duwamish prior to ratification of the treaty was a response to the immediate exigency, rather than an effort by the government to implement the treaty commission's earlier plan to relocate the Duwamish to Port Madison. Tr. 34–36.

389. The court has previously found that the Duwamish Indians objected to being removed from their traditional locale to the Port Madison Reservation. *United States v. Washington*, 476 F.Supp. at 1105 (F.F. No 14). Like a number of other tribes in the region, the Duwamish evidenced a strong attachment to their ancestral villages and lands and resisted the government's plan to remove them from their territory. Tr. 71–71; Ex. 102, at 6, 17. Beyond attachment to their own lands, the treaty-time Duwamish expressed a general animosity of uncertain origin toward the Suquamish. This attitude persisted even though the Duwamish were intermarried with the Suquamish, among other tribes, and had other cultural contacts with Suquamish people. In August, 1857, the federal Indian agent responsible for both the Duwamish and Suquamish tribes reported to the Superintendent of Indian Affairs, Washington Territory, as follows concerning the Duwamish attitude toward the Suquamish and his resultant inability during the preceding year to unite the two tribes:

[T]he most unamicable feelings have long existed between these two tribes [Duwamish and Suquamish]; this feeling is so deep rooted that, when the friendly portion of the D'Wamish Tribe were directed, by their agent during the war to

move to this [Fort Kitsap] reservation, they absolutely refused to comply with the order. They were, however, finally persuaded to move to a point on Bainbridge Island, about eight miles from the reservation occupied by the Suquamish, where they remained until the close of the war.

Their refusal to comply with the requests of their agent naturally caused them to be looked upon as little better than the hostiles, but it must be borne in mind that they were not only required to leave their own lands, but to move upon lands owned and occupied by Indians whom they regarded with feelings of hatred.

. . .

On assuming the duties of this agency I was instructed by the then superintendent to use my exertions to bring about an amicable feeling between these two tribes and, if possible, unite them under one head.

After using my utmost endeavors I found it impossible to establish a friendly feeling between them; I therefore applied for and obtained from the superintendent permission to establish a subagency for this tribe near the mouth of D'Wamish River, where I collected them during the month of August, and gave them in charge of Mr. James H. Goudy, an employee on this reservation, who has remained in charge up to the present time, and who has continued to discharge his duties in a very able and efficient manner.

I do not wish to be understood as representing these two tribes as actually hostile to each other; on the contrary, they are intermarried, and frequently visit each other, and from their proximity are frequently thrown together; yet this feeling of animosity, caused probably by some former feud, will, I am assured, preclude the possibility of their living peaceable together on one reservation.

B. Lane, "Identity and Treaty Status of the Duwamish Tribe of Indians," Ex. USA 102, at 7–8 (quoting letter dated August 1, 1857, from G. Paige to territorial Superintendent of Indian Affairs).

390. As the foregoing statement demonstrates, the local Indian agent's request to establish a sub-agency for the Duwamish on Elliott Bay at the mouth of the Duwamish River was approved by the Superintendent of Indian Affairs for Washington Territory, who at the time was Governor Stevens. In the fall of 1856, most Duwamish Indians returned to this subagency from their temporary encampment on the west side of Puget Sound. During November and December, 1856, more than half the Indians at the Duwamish subagency left that location for their traditional villages upriver and along Lake Washington. Ex. USA 102, at 5–13. Indian agents traveled to the villages to encourage Duwamish people to return to the subagency. This effort was largely unsuccessful, and most Duwamish Indians continued to reside in their traditional territory despite the absence of a reservation in that vicinity. Although several local Indian agents recommended that a reservation be established specifically for the Duwamish in or close to their territory, no such reservation was established. Some Duwamish eventually relocated to the Muckleshoot Reservation, which is within the larger Duwamish River drainage but well upstream from the Duwamish village sites in the lower drainage.

391. The court finds on the basis of historical evidence that during the years immediately following the treaty, the Duwamish Indians did not intend to join or unite with the Suquamish tribe; to the contrary, they actively resisted efforts of federal officials to unite the two tribes

under one head. The court further finds that federal Indian officials continued to regard and deal with the Duwamish as a distinct tribe during that period. This attitude is most clearly evidenced by the creation of a sub-agency for the Duwamish at the mouth of the Duwamish River following the failure of efforts to relocate the Duwamish to Port Madison and by the official recommendations that a separate reservation be set aside for the tribe.

392. Although Article VII of the Treaty of Point Elliott granted the President the authority to consolidate friendly tribes on one reservation, there is no evidence indicating that the President exercised that authority for the purpose of consolidating the Duwamish and Suquamish tribes at any time after ratification of the treaty in 1859. Accordingly, the court finds that the Suquamish and Duwamish tribes were not consolidated pursuant to Article VII of the treaty.

393. At the request of the Muckleshoot and Suquamish tribes, Dr. Barbara Lane prepared a report concerning the history of Duwamish Indian affiliation at the Muckleshoot and Port Madison (aka Suquamish) reservations. Dr. Lane testified, and also stated in her report, that she was unable to trace the movement of Duwamish Indians to the two reservations during a period of approximately twenty-five years following the treaty. Tr. 44, 94, 97; Ex. SU–SM–24, at 9–10. Dr. Lane's report, the scope of which was defined by the tribal representatives, was not intended to be a complete history of ethnography of the Duwamish people. Tr. 91–94; see Ex. SU–SM–24, at 5. Specifically, the report has a limited focus relating to two reservations in a particular time frame; it does not trace the history of the Duwamish who went to reservations other than Muckleshoot and Port Madison or who remained in their own territory after the treaty was

negotiated; and it contains less information than would a general ethno-history with respect to even these two reservations. Because of these limitations inherent in the scope of work defined by the two tribes, the report, although very thorough, does not provide a basis for evaluating the distribution of the Duwamish as a whole throughout western Washington after the negotiation of the Treaty of Point Elliott.

394. Dr. Lane was not requested to address, and her report does not address, such matters as the possible perpetuation of Duwamish tribal structure or the transfer of Duwamish political or tribal rights, including fishing rights, to any party, including the Suquamish Tribe. Tr. 92. As a consequence, her report expresses no opinion concerning the alleged acquisition of Duwamish tribal fishing rights by the Suquamish Tribe.' Consistently with these limitations, Dr. Lane expressed no opinion on the political succession issue during her testimony. *Id.*

395. Dr. Lane's report states that forty-nine allotments were made at Port Madison between 1886 and 1910, nine of which went to Indians who were identifiable, at least in part, as Duwamish. Ex. SU–SM–24, at 11–12. Three of these nine individuals first appeared on the Port Madison rolls in 1878, the first reliable census for Port Madison, and the remaining six between 1878 and 1909. *Id.* at 15–16. Although each of these nine allottees was at least in part Duwamish because he or she had at least one parent with identifiable Duwamish ancestry, in most of the nine cases the tribal affiliation of the other parent is unknown. Because exogamy was common and desired among western Washington tribes, the other parent may well have been non-Duwamish, and potentially Suquamish. Tr. 104–110; 138–140. The surviving information does not reveal

whether all of these nine allottees themselves lived in a tribal community in the traditional Duwamish territory, why they or their forebears came to Port Madison and whether the presence of Suquamish relatives might have been a factor in the decision to move there, or whether the decision of the allottees or their forebears to come to Port Madison was individual or part of a general tribal movement. The evidence is inadequate to support an inference that the nine allottees' presence at Port Madison during the half-century after the treaty is reflective of a communal or tribal decision or process by which the Duwamish Tribe, or a cohesive band thereof, united with the Suquamish Tribe.

396. The grant of allotments at Port Madison to persons with Duwamish ancestry is indicative of the government's willingness to provide allotments on that reservation to persons who were in part, or even principally, identified as Duwamish Indians. But there is no evidence that the United States regarded the approval of these allotments as in any way reflective of a political consolidation of the Duwamish and Suquamish tribes or of a transfer of tribal rights from one tribe to the other; nor is there any evidence in the record to indicate precisely what position the Suquamish Tribe took concerning the approval of these allotments. The presence of allottees identified as Duwamish is consistent with the general dispersion of individual Duwamish Indians throughout the Puget Sound region after 1890. *See* Ex. SU–SM–24, at 55. Duwamish individuals were allotted lands on other reservations as well.

397. In 1915, the members of an organization calling itself the Duwamish Tribe prepared a roll of people identified as Du-

wamish Indians. Ex. SU–SM–24, at 10, 18–22. The roll listed over 300 names. Tr. 111–112.[3] Of these, thirty-eight also appeared on the 1915 Port Madison roll and thirty-six appeared on the 1915 roll of the Muckleshoot Reservation. Dr. Lane testified that of the remaining persons listed on the 1915 Duwamish roll, numbering at least 226, some resided on other reservations and many resided off reservation. Tr. 112–113. Of the ten directors of the Duwamish tribal organization, three were listed on the Port Madison roll, two on the Muckleshoot roll, and the remaining five were from other reservations or areas. Tr. 113–115. The 1915 Duwamish roll and contemporaneous reservation rolls cannot be used to draw conclusions concerning the precise percentage of the Duwamish population in 1915 who were members of the Suquamish Tribe or resident at Port Madison, but these documents do generally indicate that less than twenty percent of identified Duwamish were enrolled at Port Madison as of 1915. The court finds that the 1915 Duwamish population figures do not support an inference that the Duwamish and Suquamish tribes had merged. If anything, they merely reflect the broad dispersion of Duwamish Indians throughout the region.

398. Dr. Lane's research and the general circumstances surrounding dispersion of Duwamish Indians in and beyond their homeland during the late 19th century suggest that some Duwamish individuals, probably accompanied by their families, moved from the traditional Duwamish territory to Port Madison. Dr. Lane testified that she did not know for a fact whether all the individuals identified as Duwamish allottees in her report had actually lived in the Duwamish territory. Tr. 104–110.

---

**3.** Dr. Lane could not provide a precise number of persons listed on the Duwamish tribal organization roll, because some of the listings

indicated only parents "and children" or "and family." Tr. 111–112.

Assuming movement of some Duwamish Indians from their traditional territory to Port Madison, the court finds that in the cultural context of the western Washington tribes these individuals would not have had the authority to transfer the fishing or resource-use rights of the Duwamish Tribe to the Suquamish Tribe. While it is well established in this case that at treaty times individuals who moved from their natal village to the village of another tribe customarily retained personal rights to return to the natal territory to fish or make use of other resources, they did not have authority to transfer such qualified use rights to relatives or neighbors in the village to which they had moved, much less transfer such rights to the entire community. *See* Tr. 139, 143; Ex. USA 20, at 20; *United States v. Washington,* 384 F.Supp. at 353 (F.F. No. 12); *United States v. Washington,* 626 F.Supp. 1405, 1490 (W.D.Wash. 1985) (F.F. No. 356), *aff'd sub nom. United States v. Skokomish Indian Tribe,* 764 F.2d 670 (9th Cir.1985). Accordingly, the court finds that the relocation of individual Duwamish Indians from Duwamish territory to Port Madison would not have been perceived by the tribes as a general transfer of Duwamish tribal rights to the Suquamish Tribe.

399. The Suquamish Tribe introduced a compilation of information showing the Duwamish ancestry of members of the Suquamish Tribe carried on the Port Madison rolls between 1942 and the present. Ex. SU–SM–44. The compilation was prepared by the Suquamish tribal enrollment officer based on information derived from a number of Suquamish rolls and also using, in part, a preliminary version of Dr. Lane's report to identify Duwamish ancestors. See Tr. 163–165, 172–173. According to the compilation, more than 70 percent of the people carried on the Suquamish rolls since 1942 have or had some Duwamish ancestry. However, this statistic taken in isolation is not meaningful. Members of the Suquamish Tribe with Duwamish ancestry trace that ancestry to only approximately 20 Duwamish individuals. It is unknown whether all of these Duwamish ancestors lived at Port Madison, *see* Tr. 179–180, and it is possible that some were never affiliated with Port Madison, but merely had descendants who moved there at one time or another. Most Suquamish listed in the compilation have only a very small percentage of Duwamish ancestry, a fact necessarily attributable to generations of intermarriage of Suquamish Indians with people having little or no Duwamish ancestry. The compilation fails to show the enrollees' percentage of Suquamish or other Indian ancestry, as distinguished from Duwamish ancestry. The compilation also does not show the relative percentage of Duwamish ancestry among people enrolled at other reservations, and the Suquamish enrollment officer had no information on this subject. *See* Tr. 184, 191. The court cannot infer from the limited information contained in the compilation that the Duwamish ancestry of modern Suquamish Indians has political significance. Such ancestry does not indicate that the Duwamish and Suquamish tribes merged or consolidated or entered into any kind of express or implied political relationship. Genealogy of recent tribal members alone is not a basis for imputing political actions to their remote ancestors. This is particularly true in this instance where the degree of relationship between the modern Suquamish Indians and Duwamish ancestors is attenuated and the frequency of intermarriage among Indian people throughout the region logically suggests that members of any tribe will have large numbers of ancestors of different tribal affiliation.

CONCLUSIONS OF LAW

103. In this subproceeding, the Suquamish Tribe claims treaty fishing rights under the Treaty of Point Elliott in Lake Washington, the Lake Washington Ship Canal, Lake Sammamish, and the Duwamish River, areas not included in its previously adjudicated usual and accustomed fishing places. See *United States v. Washington,* 459 F.Supp. 1020, 1049 (W.D.Wash.1978). The Suquamish Tribe bears the burden of proof with respect to this claim. *United States v. Washington,* 730 F.2d 1314, 1316–17 (9th Cir.1984).

104. After completion of all pretrial discovery, briefing and other pretrial proceedings, the Suquamish Tribe expressly abandoned that portion of its original claim asserting that it has treaty-secured fishing rights in the additional areas listed in Conclusion of Law 103, above, by virtue of pre-treaty fishing in those areas by the Suquamish Indians. Tr. 7. Accordingly, that aspect of its Request for Determination should be dismissed with prejudice.

■■■ 105. The only remaining aspect of the Suquamish Tribe's claim is its allegation that it is a political successor in interest to the treaty-time Duwamish Tribe, and as such currently has the right to exercise the treaty-time Duwamish Tribe's treaty fishing rights at that Tribe's treaty-time usual and accustomed fishing places. Suquamish claims this right solely on the basis of political succession.

106. The court has previously held that an earlier intervenor in this case, identified therein as the Duwamish Tribe of Indians, was not an entity that was descended from a tribal signatory to the Treaty of Point Elliott or that had maintained an organized tribal political structure, and therefore did not hold fishing rights reserved to the treaty signatory Duwamish Tribe. *United States v. Washington,* 476 F.Supp. at 1104–1105. Because the court's earlier holding extends only to the status of that intervenor entity, it does not foreclose adjudication of successorship claims by the Suquamish Tribe or other parties.

■■■ 107. The Suquamish Tribe's political succession claim is one of treaty status in the sense that the Suquamish Tribe asserts that it now enjoys treaty rights of the treaty signatory Duwamish Tribe that were not originally reserved to the Suquamish Tribe. As a general rule, treaty status is established when "a group of citizens of Indian ancestry is descended from a treaty signatory and have maintained an organized tribal structure." *United States v. Washington,* 520 F.2d at 693. The Ninth Circuit has held that "a single necessary and sufficient condition for the exercise of treaty rights" is that "the group must have maintained an organized tribal structure." *United States v. Washington,* 641 F.2d at 1371. A claim of political or tribal succession thus presents essentially a factual question as to whether the circumstances show that the tribal structure of the treaty signatory is in some identifiable sense perpetuated or subsumed in the alleged successor tribe. *See id.* at 1374. Because post-treaty historical circumstances vary greatly among the tribes in the case area, it would be inappropriate and perhaps impossible to formulate a rigid or precise test to be applied in all political succession cases. In a case such as this one, where one signatory tribe claims the rights of a second signatory tribe that occupied an entirely distinct drainage area, the court will look to all indicia of tribal relationship to assess whether there has been a consolidation or merger of the tribes, or cohesive bands thereof, sufficient to combine their tribal or political structures. In so doing, the court is cognizant that successorship claims of necessity will usually be decided

on the basis of circumstantial evidence and inference.

108. Although the tribes identified in the various western Washington treaties were generally constituted from smaller bands, "each tribe was understood to be an entity for the purpose of each treaty." *United States v. Washington,* 520 F.2d at 688. Similarly, "[e]ach tribe bargained as an entity for rights which were to be enjoyed communally." *Id.* (citation omitted). This court previously held that the fishing right reserved to each signatory tribe "is distinct from rights or privileges held by others." *United States v. Washington,* 384 F.Supp. at 402. The nominal identification of Seattle in the treaty as chief of both the Suquamish and Duwamish Tribes does not defeat these principles, since the Duwamish (or D'Wamish) and Suquamish tribes are each identified in the treaty as a distinct entity and the selection of chiefs and subchiefs was to a considerable extent a matter of convenience for the United States. *Fishing Vessel,* 443 U.S. at 664 n. 5, 99 S.Ct. 3055; *United States v. Washington,* 520 F.2d at 682. Consequently, the Suquamish and Duwamish tribes were not merged or consolidated by the Treaty of Point Elliott itself.

109. No evidence has been introduced suggesting that the United States attempted to use the President's authority under Article VII of the treaty to consolidate the Duwamish and Suquamish tribes following ratification of the treaty. Nor was there evidence that the United States applied a policy of requiring that all of the tribes who were parties to the Stevens Treaties remove to, or remain on, a reservation. Thus, although the federal officials origi-

nally envisioned that Port Madison would become the reservation for both the Suquamish and Duwamish tribes, that intention was not carried into effect by the United States and the two tribes were not consolidated pursuant to Article VII of the Treaty of Point Elliott.

110. Because there is no evidence indicating that the Duwamish Tribe, or a cohesive band thereof, took up residence on the Port Madison Reservation, there is no basis for inferring from their physical proximity that a consolidation of the two tribes occurred.[4]

111. The treaty rights of tribes that are parties to the western Washington treaties are "communal in nature" and "are not inheritable or assignable by the individual member to any person, party or other entity of any kind whatsoever." *United States v. Washington,* 476 F.Supp. at 1110. The evidence concerning the movement of some Duwamish Indians over time to Port Madison does not demonstrate an acquisition by Suquamish of the Duwamish Tribe's treaty rights.

112. The Suquamish Tribe argues that it should be considered a political successor to the Duwamish Tribe on the basis of certain analogies it perceives with respect to the Tulalip and Muckleshoot tribes. *See United States v. Washington,* 384 F.Supp. at 364–367, 459 F.Supp. at 1058, 1060. As noted above, treaty-status issues in this action should be decided on a fact-specific basis and not by analogy. *United States v. Washington,* 641 F.2d at 1374. Because historical analogies can often be simplistic and misleading, the court must evaluate the evidence

---

4. Joint occupancy of one reservation by two tribes, without evidence of additional circumstances showing intertribal unification, would not be enough to support a finding of consolidation or merger. Some reservations are oc-

cupied by more than one functioning tribe. *See, e.g., Northern Arapahoe Tribe v. Hodel,* 808 F.2d 741, 744 (10th Cir.1987) (noting that Arapahoe and Shoshone tribes have separate governments on the same reservation).

in each successive case on its own merits. Each Tribe has its own distinct post-treaty history. Suquamish's argument overlooks significant historical distinctions. For example, unlike the Suquamish Tribe, which is itself a party to the treaty, the post-treaty Tulalip and Muckleshoot tribes were not signatories to the treaty, but were composed of Indians who are named as tribal parties to the treaties. The Tulalip and Muckleshoot reservations are also located in the same general drainage-basin territories occupied by their forebears; by contrast, Port Madison is outside and across Puget Sound from the traditional Duwamish territory. Suquamish's argument by analogy is therefore unpersuasive.

113. There is no direct or circumstantial evidence showing that the Duwamish and Suquamish tribes, voluntarily consolidated, merged or entered into any other relationship by which the Suquamish Tribe acquired treaty rights of the Duwamish Tribe. As a consequence, the court concludes that Suquamish has not proved by a preponderance of the evidence that the Suquamish Tribe succeeded to the tribal treaty rights of the Duwamish Tribe. The Suquamish Tribe therefore does not have the status of political successor in interest to the treaty-time Duwamish Tribe.

## DECISION AND ORDER RE TULALIP MOTION FOR PRELIMINARY INJUNCTION TO ENJOIN LUMMI FISHING IN AREA 8A

### Subproceeding No. 86–5

### (March 13, 1989)

█ The Tulalip Tribes move for a preliminary injunction enjoining all fishing by the Lummi Indian Tribe in WDF Catch Reporting Area 8A until final resolution of intertribal allocation in Sub-proceeding No. 86–5. Upon due consideration of the written and oral arguments of the parties and the record herein, the court grants the motion for the reasons and upon the conditions set forth herein.

█ "The purpose of the preliminary injunction is to preserve the status quo between the parties pending a final determination of the merits of the action." 7-Pt. 2 Moore's Federal Practice, Para. 65.04[1] at 65–30. " 'The status quo is the last uncontested status which preceded the pending controversy.' " *Tanner Motor Livery, Ltd. v. Avis, Inc.,* 316 F.2d 804, 809 (9th Cir.), *cert. denied,* 375 U.S. 821, 84 S.Ct. 59, 11 L.Ed.2d 55 (1963).

The primary focus of the Tulalip's motion is upon the preservation of the status quo. According to the Tulalip's, the status quo is that tribal fishing in Area 8A is by the Tulalip and Stillaguamish Tribes only by virtue of agreements concerning Area 8A. The Tulalip's further argue:

The status quo, which clearly is no Lummi harvest in the area, should continue until completion of the intertribal allocation subproceeding. This is essentially what the Court ordered previously in this subproceeding in the Area 9 1986 coho situation. To allow Tribes to open what are essentially new fisheries pending completion of the mediation or trial on the merits would violate fundamental fairness.

The Lummis respond that the Mediation Order does not explicitly or implicitly contemplate that the parties to it remain in situ, so to speak, until completion of Subproceeding No. 86–5.

The cannot agree with the Lummis. The Mediation Order in this sub-proceeding is a dead letter if the parties to it can act unilaterally. However, at the same time, the Lummis must have a vehicle by which they can preserve for mediation and/or litigation if the mediation fails their

perceived right(s) to fish at all in Area 8A and/or to share in the harvests in Area 8A. The court concludes that the Tulalips cannot use this sub-proceeding to obtain a court ruling on the Lummis rights in Area 8A in advance of a mediated decision or outside the mediation process.

Therefore, the court will act to preserve the status quo in the sense of the mediation process by granting injunctive relief to the Tulalips with one condition. This condition is that the issues concerning the Lummis right(s) to fish in Area 8A are preserved in the first instance for mediation. Thus, the court grants the motion solely on the ground that the Lummis have not in fact fished in Area 8A for a number of years preceeding entry of the Mediation Order. The court expresses no opinion in this order concerning the extent of the Lummis' usual and accustomed fishing places, the home waters and/or primary rights theory advanced by the Tulalips, or the existence and/or continued enforceability of any agreements between the Tulalips and the Lummis concerning their respective rights in what is now Area 8A.

IT IS SO ORDERED.

## ORDER RE TRIBAL MOTION FOR ATTORNEYS' FEES

Subproceeding No. 80–2

(February 15, 1990)

In *United States v. Washington*, 813 F.2d 1020 (9th Cir.1987), *cert. denied sub nom. Makah Tribe v. Washington*, 485 U.S. 1034, 108 S.Ct. 1593, 99 L.Ed.2d 908 (1988), the Ninth Circuit held that this action brought by the United States on behalf on Indian Tribes against the State of Washington did not involve civil rights or Fourteenth Amendment rights but,

rather, interpretation of treaties.[1] Consequently, awards of attorneys' fees under 42 U.S.C. § 1988 for Phase I of this action were not proper. In so holding, the Ninth Circuit stated at 1023:

> It is not disputed that the Indians had rights under the treaty. Just exactly what those rights were was unknown until the Supreme Court decision [in *Fishing Vessel* in 1979]. If the State of Washington violates these now known and well-delineated rights, there would be an actual conflict between state and federal law which might give rise to a § 1983 action. <u>See</u> *White Mountain Apache Tribe v. Williams*, 798 F.2d 1205 (9th Cir.1985), *as amended by* 810 F.2d 844, 850 n. 8 (9th Cir.1987), *cert. denied sub nom. White Mountain Apache Tribe v. Arizona State Transp. Bd.*, 479 U.S. 1060, 107 S.Ct. 940, 93 L.Ed.2d 990 (1987). That, however, has not yet happened and is not the situation here.

The Nooksack, Sauk–Suiattle, Upper Skagit, Swinomish, Stillaguamish, Muckleshoot, Nisqually, Squaxin Island, Skokomish, Suquamish, Port Gamble Klallam, Jamestown Klallam and Lower Elwha Klallam Indian Tribes, the Lummi Indian Tribe, the Quinault Indian Nation, the Tulalip Indian Tribe, and the Puyallup Indian Tribe (hereinafter referred to as the moving Tribes) now move the court to adopt the recommendations in the Third Report and Recommendation On Phase I Attorneys' Fees signed by Magistrate Weinberg on February 4, 1987 with respect to Proceeding No. 60A, Proceeding No. 66, and Proceeding No. 77.

Upon due consideration of the written arguments of the parties and the record herein, the court denies this motion with respect to Proceeding No. 60A and Pro-

---

1. The Ninth Circuit reached the same conclusion with respect to an award of attorneys' fees in Phase II of this action. *United States v. Washington*, 873 F.2d 240 (9th Cir.1989).

ceeding No. 66 and grants the motion with respect to Proceeding No. 77 for the reasons set forth herein.[2]

## A. Proceeding No. 60A.

██ In Proceeding 60A, the district court's entry of an injunction in 1981 against the State on behalf of the Quinault Indian Nation was affirmed by the Ninth Circuit. *United States v. Washington,* 626 F.Supp. 1405, 1428–1432 (W.D.Wash.1985), *aff'd,* 694 F.2d 188 (9th Cir.1982), *cert. denied,* 463 U.S. 1207, 103 S.Ct. 3536, 77 L.Ed.2d 1387 (1983). However, this proceeding was one of those whose award of attorneys' fees incurred before the district court was denied by the Ninth Circuit. The Quinault Indian Nation now seeks attorneys' fees for work performed in the Ninth Circuit and in successfully resisting the Petition for Writ of Certiorari. According to the Tribes' opening brief, "[t]he tribe's request for attorneys fees for appellate work was transferred to the district court by order of the Ninth Circuit." The Order Granting Station to Transfer Request for Attorneys Fees to District Court issued on November 8, 1983 states:

> The court has considered the appellees' motion for transfer of their request for attorneys' fees to the district court. The appellants have filed no opposition to this motion. The appellees' motion is hereby granted. The appellees' request for attorneys' fees is transferred to the district court for determination of entitlement to and amount of attorneys' fees.

The court can see no logical or analytical reason why there would a difference between the purpose of litigation in the trial court and in the appellate courts—the underlying issues will be the same. Consequently, the court concludes that these fees are not recoverable under Section 1988.

## B. Proceeding 66.

Proceeding 66 is reported at 626 F.Supp. 1405, 1458–1465. From the court's reading of the pertinent orders, the underlying issue in Proceeding 66 was allocation and fishery management, the State conceding that the tribes were not receiving their 50% share and agreeing that the balance must be redressed. 626 F.Supp. at 1459. In this regard, the Ninth Circuit has denied a request for attorneys' fees under Section 1988 in a proceeding involving similar issues of allocation and fishery management. *United States v. Washington,* 774 F.2d 1470, 1481 (9th Cir.1985). Consequently, the Tribes' motion is granted with respect to this proceeding.

## C. Proceeding No. 77

██ The Tribes and the State concur that the Tribes are entitled to claim attorneys' fees incurred in connection with this sub-proceeding pursuant to Rule 37, Federal Rules of Civil Procedure.

However, the State argues that this request for fees should be denied on the ground that the Tribe's 17 month delay in renewing this request for attorneys' fees, which delay the State asserts was without substantial justification, is a "special circumstance" warranting its denial.

However, as the Tribes respond, there has been no substantial delay in seeking this request. The court stayed consideration of Magistrate Weinberg's Third Report and Recommendation on Phase I Attorneys' Fees pending the outcome of the State's appeal of earlier fee awards. The Ninth Circuit did not reverse the award of attorneys' fees in Phase Two until May 22,

---

**2.** The court rules on this motion without oral argument, the court concluding that oral argument is not necessary to the resolution of the motion.

1989. On June 7, 1989, the court in its order for a status conference and the Tribes requested in their status conference statements that their requests for attorneys's fees be renewed, a request to which the State voiced no objection.

Consequently, the court concludes that these fees are recoverable.

IT IS SO ORDERED.

## DECISION AND ORDER RE CROSS–MOTIONS FOR SUMMARY JUDGMENT

### Subproceeding No. 89–02

### (February 15, 1990)

### A. Background

On March 3, 1989, the Jamestown Klallam Tribe of Indians, the Lower Elwha Tribal Community, the Port Gamble Indian Community, and the Skokomish Indian Tribe of the Skokomish Indian Reservation (hereinafter referred to as the Requesting Tribes) filed a Request for Determination wherein the court is asked to determine: that the usual and accustomed fishing area of the Lummi Tribe does not include the Strait of Juan de Fuca, Admiralty Inlet and/or the mouth of Hood Canal. In *United States v. Washington,* 384 F.Supp. 312, 419 (W.D.Wash.1974), Judge Boldt held that the parties may invoke the continuing jurisdiction of the court to determine, in pertinent part, whether or not the actions by any party are in conformity with the Boldt decision or to determine the location of any tribe's usual and accustomed fishing grounds not specifically determined by the Boldt decision.

Following a status conference conducted on June 28, 1989 by Magistrate Weinberg, Magistrate Weinberg ordered that cross motions for summary judgment be filed addressing (1) whether the determination of Lummi usual and accustomed fishing places set forth in Finding 46 of the Boldt decision, *United States v. Washington,* 384 F.Supp. 312, 361 (W.D.Wash.1974) includes the Strait of Juan de Fuca, Discovery Bay, and Admiralty Inlet, and (2) the availability of equitable defenses.[1]

1. The Tulalip Tribes argue that summary judgment with respect to the meaning of Finding 46 of the Boldt decision is inappropriate because the interpretation of Judge Boldt's intentions with regard to the scope of "northern Puget Sound" and "present environs of Seattle" cannot be determined by either the record before Judge Boldt at the time the finding was made or subsequently. First of all, as noted *infra,* the court looks only to the evidence before the court whose judgment is being interpreted. Secondly, the court concludes that that record suffices to allow an interpretation.

The Hoh, Quileute and Nisqually Tribes object to the Lummi's motion for summary judgment to the extent that the Lummi intend it to encompass the Lummi's right to fish halibut and other nonanadromous species in the area described in Finding 46. The court understands that the Boldt decision covered anadromous species such as salmon and steelhead. In this regard, it should be noted that the Order for Program to Implement Interim Plan, reported at 459 F.Supp. at 1035–1038, states in pertinent part: "1. In order to be entitled to exercise off-reservation treaty fishing rights to nonanadromous fish and shellfish, any tribe party to this case shall, prior to any attempt to exercise such rights, present prima facie evidence and arguments supporting its claim to treaty entitlements to such nonanadromous fish and shellfish upon which the court may make a preliminary determination as to the tribe's entitlement to nonanadromous fish and shellfish...." However, this matter commenced because the Lummi's issued regulations to fish for halibut. As the Lummis point out the locations of fishing for halibut by the tribes is determined in accordance with the decisions and orders in *United States v. Washington. See* 50 C.F.R. § 301.19 (1988). Of course, this regulation has no relevance to the issue whether or not a particular tribe has a treaty right to fish a particular specie. Nonetheless, if there is an issue that the Lummi (or any other tribe currently fishing for halibut) has no treaty right to do so,

### B. Determination of Usual and Accustomed Fishing Places.

The term "usual and accustomed fishing places" is defined in the Boldt decision as "every fishing location where members of a tribe customarily fished from time to time at and before treaty times, however distant from the then usual habitat of the tribe, and whether or not other tribes then also fished in the same waters...." 384 F.Supp. at 332.

The usual and accustomed fishing places of the Lummi Tribe is set forth in the Boldt decision as follows:

> 45. Prior to the Treaty of Port Elliott, the Lummi, Semiahmoo and Samish Indians had been engaged in trade in salmon, halibut and shellfish both with other Indians and with non-Indians. [FPTO § 3–42] This trade continued after the treaty. [Ex. USA–30, p. 6] At the time of the treaty they maintained prosperous communities by virtue of their ownership of lucrative saltwater fisheries. The single most valuable fish resource was undoubtedly sockeye, which the Lummis were able to intercept in the Straits on the annual migration of the sockeye from the ocean to the Fraser River. [Ex. USA–30, p. 11] Lummi Indians developed a highly efficient technique, known as reef netting, for taking large quantities of salmon in salt water. [Ex. USA–30, p. 11] Aboriginal Indian reef netting' differs from present methods and techniques described by the same term. [FPTO § 3–40] The Lummis had reef net sites on Orcas Island, San Juan Island, Lummi Island and Fidalgo Island, and near Point Roberts and Sandy Point. [Ex. USA–30, p. 23; Exs. USA–62, USA–63; Tr. 1699, l. 2 to 1701, l. 21] ... These Indians also took spring, sile and humpback salmon and steelhead by gill nets and harpoons near the mouth of the Nooksack River, and steelhead by harpoons and basketry traps on Whatcom Creek. They trolled the waters of the San Juan Islands for various species of salmon. [FPTO § 3–42; Ex. USA–30, pp. 6–25; Ex. G–21, pp. I–19–I–21]

> 46. In addition to the reef net locations listed above, the usual and accustomed fishing places of the Lummi Indians at treaty times <u>included the marine areas of Northern Puget Sound from the Fraser River south to the present environs of Seattle, and particularly Bellingham Bay.</u> Freshwater fisheries included the river drainage systems, especially the Nooksack, emptying into the bays from Boundary Bay south to Fidalgo Bay. [Exs. USA–20, p. 35; USA–30, pp. 23–26; Exs. PL–94a, b, c, d, e, t, u, v, w, x; Ex. G–26, pp. II–9 to II–13; Exs. USA–60, USA–61, USA–62, USA–63, USA–64; Tr. 1665, l. 4–11, l. 23–24] [Emphasis added].;

#### 1. Interpretation of Judgment.

 "It is the responsibility of the reviewing court to construe a judgment so as to give effect to the intention of the issuing court, not to that of the parties ... If the judgment is unambiguous, the court may not consider 'extraneous' evidence to explain it...." *Narramore v. United States,* 852 F.2d 485, 490 (9th Cir.1988).

---

the court suggests that a sub-proceeding be commenced to get this issue resolved forthwith.

In the "Reply of Lummi Indian Tribe to Requesting Tribes' Motion of Summary Judgment and to the Responses of the Other Parties", it is stated that the "Lummi Tribe does not claim fishing rights in the eastern portion of the Strait of Juan de Fuca and, therefore, does not claim fishing rights in Catch Reporting Areas 6C or 5." WDF 6C encompasses the area in the Strait of Juan de Fuca east of the western point of Vancouver Island.

However, "[i]f there is any ambiguity or obscurity or if the judgment fails to express the rulings in case with clarity or accuracy, reference may be had to the findings and the entire record for the purpose of determining what was decided." *Security Mut. Cas. Co. v. Century Cas. Co.,* 621 F.2d 1062, 1066 (10th Cir.1980); *see also Bassey and Selesko, P.C. v. Condon,* 694 F.Supp. 327, 330 (E.D.Mich.1988) *quoting Pen–Ken Gas & Oil Corp. v. Warfield Natural Gas Co.,* 137 F.2d 871, 885 (6th Cir.1943) ("A Court's judgment must be read and interpreted in the light of what was before it.").[2]

In applying these standards, the Lummis caution the court to recognize the scarcity of direct evidence from which usual and accustomed fishing places can be inferred and caution against attempting to locate geographically therefrom every specific bay or inlet, etc. While the court thinks this cautionary reminder is well-taken, it cannot be looked upon as anything more than that.

The court cannot agree with the parties that the geographic scope of Finding 46 intended by Judge Boldt is unambiguous. Consequently, the court examines the evidence presented to Judge Boldt in connection with the underlying proceeding.

The court has reviewed the copies of the evidence to which Judge Boldt made reference as supporting Findings 45 and 46 which are attached to the Declaration of Dr. Barbara Lane re Lummi Usual and Accustomed Fishing Places, which declaration was executed on March 23, 1989 in connection with this sub-proceeding. Dr. Lane avers in this declaration in pertinent part:

1. I was the principal expert anthropological and ethnohistorical witness for the United States and the plaintiff tribes in the original trial proceedings of this case which led to the court's Final Decision No. 1, and I have continued to be an expert witness in these fields in subsequent proceedings in this case. My reports have been admitted as exhibits in this case and have formed a portion of the basis for many of the court's findings in Final Decision No. 1 and in subsequent decisions of the court. My reports and testimony have been cited by the court as part of the basis for numerous of its Findings concerning treaty-time Indian fishing practices and the treaty-time usual and accustomed fishing places of various tribes.

2. Specifically, with respect to the matter before the court in this subproceeding No. 89–2, Exhibits Nos. USA 20 and 30, cited in Findings Nos 44 to 47 (384 F.Supp. 312 at 360–361), were reports which I prepared. Transcript excerpts at pp. 1696–1706 (Sept. 5, 1973) are my testimony on direct examination by the Lummi attorney, Mr. Alvin Ziontz. The cited Exhibits USA 62 and 63 were 1853 sketches of Haro and Rosario Straits and an undated sketch of Bellingham Bay and San Juan Islands, respectively, which I obtained from files of the U.S. Archives and about which I testified during that testimony. The transcript references to pp. 1665, 2036–2101 and 2812–2814, cited in the Court's Findings were also from my testimony.

The admitted Facts set forth in the Final Pretrial Order (FPTO) §§ 3–12, 3–39, 3–40 and 3–42 cited by the court in

---

**2.** The Lummis argue that the Requesting Tribes are barred by the doctrine of collateral estoppel from relitigating Finding 46. However, the purpose of this sub-proceeding is not to relitigate the Lummis' usual and accus- tomed fishing places but, rather, to interpret the geographic scope of that award as found by Judge Boldt in Finding 46. Consequently, the issue of collateral estoppel does not arise.

its Lummi Findings, [sic] were in conformity with my reports and findings. 3. In its Finding of Fact No. 45 ... the court found that the Lummi Indians intercepted sockeye salmon 'in the Straits on the annual migration of the sockeye from the ocean to the Fraser River.' The citation for this Finding is Exhibit USA 30, my Anthropological Report on the Identity, Treaty Status and Fisheries of the Lummi Tribe of Indians, page 11. My report at that page (copy attached as Attachment A hereto) referred to interceptions by the Semiahmoo, Lummi and Samish Indians who were the principal pre-treaty predecessors of the present Lummi Tribe—see p. 2 of Exhibit USA 30 (pp. 1–3 attached as Attachment B hereto). Semiahmoo territory reached from Point Roberts south to Point Whitehorn (Exh. DBA 30, p. 1). The Indians then known as Lummi lived on Lummi Island on the mainland in the vicinity of the present Lummi Reservation and on various islands of the San Juan Islands group. *Id.* The Samish were on the mainland south of the Lummi and on various islands of the San Juan group, Guemes Island, Samish Island and other nearby islands identified on pp. 1–3 of my report (Attachment B hereto).

4. The Straits referred to in my report—USA Exhibit 30 at p. 11—although not specifically denominated therein, were Haro, Rosario and Georgia Straits and I did not intend the reference to include the Strait of Juan de Fuca. This is confirmed by my reference in the same paragraph to 'earlier' interceptions of these fish 'as they passed through the Strait of Juan de Fuca.' A reading of my complete report, as well as the transcript of my testimony at the trial, including specifically my interrogation by the then attorney for the Lummi Tribe, Mr. Alvin Ziontz, (Tr. 1696–1706) will show that at no time did I refer to treaty-time fishing in the Strait of Juan de Fuca by the entities which were predecessors of the present Lummi; Tribe. The maps which I obtained from the National Archives and which the United States introduced at the trial as Exhibits USA 59 through 64, and upon which the Lummi attorney, Mr. Ziontz, questioned me (Tr. 1696–1706), showed several Lummi reefnet sites in the San Juan Island group but did not indicate any Lummi fishing grounds westerly from the Island group.

5. At the time of my 1973 reports and testimony, I had not reached, expressed or intended any conclusion that the treaty-time U & A fishing grounds and stations of the predecessor Indians to the present Lummi Tribe included (1) the Strait of Juan de Fuca, (2) the open marine water beyond the immediate near shore area southwesterly of the San Juan Islands and westerly of northern Whidbey Island, or the Admiralty Inlet passageway along the west side of Whidbey Island. (See Attachment C & D hereto for the Lummi fishing places that I identified. Attachment C is p. 39 of my Summary Report Ex. USA 20. Attachment D is pp. 23–27 of my Lummi Report, Ex. USA 30 including the unnumbered map page referred to in Attachment A. The symbol beside the words 'reefnet grounds' north of Port Angeles is an identification of the symbol and not a reefnet location). The evidentiary sources cited in Findings Nos. 45–47 do not specifically refer to those waters. The reference in the court's Finding No. 46 to 'south to the present environs of Seattle' is apparently based on paragraph 4 of page 26 of my Lummi Report (Ex. USA 30), a paragraph that refers to the 'traditional fisheries of the post-treaty Lummi' and

does not discuss the routes by which the Lummis reached the environs of Seattle. My statement in that paragraph, which differs from that in Finding No. 45, was 'other fisheries in the Straits and bays from the Fraser River south to the present environs of Seattle were utilized.' In the time available before the presently scheduled court hearing on this subproceeding, I am unable to formulate a conclusion on treaty-time existence or extent of fishing activity by those Lummi predecessors in those waters.

6. I do not consider the term 'Northern Puget Sound' as used in the Court's Finding No. 46 or any other language in the Court's Findings to include the Strait of Juan de Fuca, or the Hood Canal area waters southerly of a line from Olele Point to the tip of Foulweather Bluff.

In attempting to interpret Judge Boldt's findings, the court keeps in mind that Dr. Lane was an expert witness on behalf of the tribes and did not represent one tribe against another tribe. Moreover, Judge Boldt found that Dr. Lane's testimony and supporting exhibits were credible, to say the least:

[T]he court finds that in specific facts, the reports of Dr. Barbara Lane, Exhibits USA–20 to 30 and USA 53, have been exceptionally well researched and reported and are established by a preponderance of the evidence. They are found to authoritative and reliable summaries of relevant aspects of Indian life in the case area at and prior to the time of the treaties, including the treaty councils, Indian groups covered by the treaties, the purposes of the treaties and the Indians' understanding of treaty provisions. In these particulars, nothing in Dr. Lane's report and testimony was controverted by any credible evidence in the case. Dr. Lane's opinions, infer-

ences and conclusions based upon the information stated in detail and well documented in her reports, appeared to the court to be well taken, sound and reasonable....

384 F.Supp. at 350.

Of particular importance to the resolution of these motions for summary judgment are Attachments C and D referred to in paragraph 5 of Dr. Lane's declaration. As noted by Dr. Lane, Attachment C is a copy of page 39 of Dr. Lane's Summary Report, which Summary Report was admitted as Exhibit USA–20 in the trial and page 39 of which is cited by Judge Boldt in support of Finding No. 46. Attachment C states in pertinent part:

K. Lummi

1. The Lummi Indian Tribe is composed primarily of descendants of Indians who in 1855 were known as Lummi or Nook–Lummi and who lived in the area of Bellingham Bay and near the mouths of the river emptying into it.

. . .

3. The principal fisheries of the Lummi included reef-net locations for sockeye at Point Roberts, Village Point, off the east coast of San Juan Island as well as other locations in the San Juan Islands. Other fisheries included Bellingham Bay and the surrounding saltwater areas. The Lummi had important freshwater fisheries on the river system draining into Bellingham Bay.

4. Several Lummi signatories to the Treaty of Point Elliott were owners of valuable reefnet locations near Point Roberts.

Attachment D to Dr. Lane's declaration is a copy of pages 23–27 of Dr. Lane's Lummi Report, which Lummi Report was admitted as Exhibit USA–30 at the trial and

pages 23–26 of which were cited by Judge Boldt as authority for Finding No. 46. Attachment D states in, pertinent part:

### USUAL AND ACCUSTOMED FISHING AREAS

While it is not possible to pinpoint every fishing site used by the ancestors of the present Lummi Tribe of Indians prior to the Treaty of Point Elliott, it is feasible to indicate the general area of their traditional fishing operations and within the general area to designate certain sites as important or principal fishing locations.

The pre-treaty Lummi, along with the Semiahmoo and Samish, both of whom were subsumed with the Lummi at the Treaty of Point Elliott, owned reefnet locations in the San Juan Islands, off Point Roberts, off Lummi Island and Fidalgo Island.

The reefnetting grounds off Point Roberts were the largest in the entire area and were situated within the aboriginal territory of the Semiahmoo. They were used not only by the Semiahmoo but also by Saanich, Lummi, and other Indians.

The grounds off Village Point, Lummi Island were second in size to the Point Roberts grounds. At least two of the Lummi signers of the Point Elliott Treaty owned reefnet locations off Village Point.

The main Samish location was off Iceberg Point, Lopez Island in the San Juans. Other Samish and Lummi locations were located off the southern shores of Lopez. The Samish also fished with reefnets off Langley Point on Fidalgo Island.

Other Lummi reefnet grounds were located off Shaw Island, Orcas Island, Waldron Island, and off Cherry Point on the mainland.

The Birch Point grounds off Birch Bay lay within the aboriginal territory of the Semiahmoo people.

In addition to using the reefnetting grounds noted above, the ancestors of the present Lummi Tribe of Indians also trolled for salmon in the contiguous salt waters of Haro and Rosario Straits and in the islands, speared them in the bays and streams of the mainland, and took them by means of weirs and traps in the rivers. There were, in addition, other important fisheries, including halibut banks, but discussion here is limited to salmon (including steelhead) fisheries.

The traditional fishing areas discussed thus far extended from what is now the Canadian border south to Anacortes. This description includes the traditional fishing areas of the Semiahmoo and the Samish. Some of the present Lummi Tribe are descendants of the pre-treaty Semiahmoo and Samish groups. Other descendants of those pre-treaty entities have become members of the Lummi Tribe and those descendants would, of course, legitimately make claim to some of the usual and accustomed fishing area included here.

In addition to the home territory discussed to this point, Lummi fishermen were accustomed, at least in historic times, and probably earlier, to visit fisheries as distant as the Fraser River in the north and Puget Sound in the south.

In the same manner, Saanich, Clallam, Skagit and other Indians fished in waters described above as within Semiahmoo, Lummi and Samish territory. The Straits and Sound were traditional highways used in common by all Indians of the region and most saltwater fisheries traditionally were given

free access areas. This point is discussed at some length in the Summary of Anthropological Report, pages 15–19. While it is useful for certain purposes to speak of Lummi waters, or Samish territory, it is important to note that they by no means implies exclusive rights to one group. That these Indians travelled widely and frequently throughout the waters of the Sound and Straits is commented on by numerous early observers.

CONCLUSIONS

. . .

4. The traditional fisheries of the post-treaty Lummi included reefnet sites in the San Juan Islands, off Point Roberts, Birch Point, Cherry Point, and off Lummi Island and Fidalgo Island. Other fisheries in the Straits and bays from the Fraser River to the present environs of Seattle were utilized. Freshwater fisheries included the river drainage systems emptying into the bays from Boundary Bay south to Fidalgo Bay.

The Lummis contend that the testimony of J.B. Finkbonner and of Dutch Kinley during the trial establish that the Lummis' usual and accustomed fishing places include the areas now encompassed by WDF Areas 6, 6B and 6D. Submitted as the Lummis' Exhibit D in this sub-proceeding is the testimony of J.B. Finkbonner transcribed at pp. 2998–2999:

Q. All right, what other areas beyond the reef net areas does your tribe consider to be usual and accustomed fishing grounds. . . .

. . .

A. Well, I think the tribe takes in all of Puget Sound, all the upper part.

Q. All of the upper part?

A. Around the San Juan Islands and part of the Strait of Juan de Fuca.

Q. How far up the Straits [sic] do you claim rights?

A. Clear up to the Makahs.

Q. Up to the Makahs, up to the reservation?

A. Up to where their accustomed fishing grounds are.

Q. If I understand you correctly, you do claim salt water fishing areas encompassing the entire San Juan Island group, and up the Strait of Juan de Fuca to the Makah Reservation?

A. Yes.

Submitted as the Lummis' Exhibit E in this sub-proceeding is the testimony of Dutch Kinley transcribed at pp. 3074–3075:

Q. Now, as a Lummi Indian have you fished at places which you consider to be the usual and accustomed places of the Lummi Indians?

A. Yes.

Q. In addition to the Nooksack River and Bellingham Bay, what are those other places?

A. I fished throughout Puget Sound purse seining, I did own a purse seine boat at one time.

Q. And how far up the Straits [sic] have you gone in view of your concern of your usual and accustomed places?

A. I have fished in the Straits, I have fished in Whidby [sic] Island south and into the Canadian border.

Q. How far west in the Straits have you gone in the usual and accustomed grounds of the Lummis?

A. Until they intercepted into the Makahs usual and accustomed grounds, I even fished on that, too.

. . . .

However, as noted by the parties opposing the Lummis in this sub-proceeding, Judge Boldt requested that the parties' respective proposed Findings of Fact and

Conclusion of Law be annotated to the record. As Judge Boldt explained:

> ... Every issue, proposed finding of fact and conclusion of law, of whatever importance, has been individually considered and determined in the Findings of Fact and Conclusions of Law on file in this case, excepting only with a few reservations that are stated and explained in each instance.
>
> ...
>
> ... In addition to consideration of the ... evidence and material by the court, more than 500 proposed findings of fact and conclusions of law, submitted by counsel and annotated to the record, have been checked to determine the accuracy of every citation made by any counsel alleged to support a proposed finding or conclusion. Many of the proposed findings and conclusions were modified ... and additional findings and conclusions not developed by any party were developed....

384 F.Supp. at 347–348. These statements by Judge Boldt are very important because it must be noted that neither the testimony of J.B. Fihkbonner or Dutch Kinley quoted above was cited by Judge Boldt in support of either Findings 45 or 46.

 There is no question in the court's mind from the evidence presented to Judge Boldt that the Lummis' usual and accustomed fishing places were not intended to include the Strait of Juan de Fuca. The court is further persuaded that the mouth of the Hood Canal would not be an area which Judge Boldt would have intended to include in the Lummis' usual and accustomed fishing places. These conclusions are based upon the testimony of Dr. Lane when looking at a map of the area. While Admiralty Inset is not part of Puget Sound, it runs into Puget Sound and is in the general area at least of the environs of present-day Seattle. Nonetheless, while Puget Sound is referred to in the evidence before Judge Boldt, Admiralty Inlet is not referred to by name in Dr. Lane's evidence and she states that she did not intend to express any opinion with regard to Lummi usual and accustomed fishing rights in this area. Consequently, the court concludes from the evidence presented to him that Judge Boldt did not intend Admiralty Inlet to be part of the Lummis' usual and accustomed fishing places.[3]

### 2. WDF Catch Areas.

 Contending that Finding 46 at a minimum includes the easternmost parts of WDF Catch Reporting Areas 6 and 6B as suggested by the BIA map of 1977, a copy of which is attached to the Lummi's papers as Exhibit B, the Lummis assert that "under the presumption against subdividing catch reporting areas, the Lummi right to fish extends throughout Areas 6 and 6B [Emphasis added]." As support for this "presumption", the Lummis refer the court to Finding 381 of the Findings of Fact and Conclusions of Law In re, Tulalip Tribes' Request for Determination of Usual and Accustomed Fishing Places:

> 381. In addition to the above, the evidence as a whole, when applied consis-

---

**3.** A number of times in their briefs the Lummis refer the court to the brevity of evidence and lack of documentary evidence supporting findings concerning the traditional fishing places of the Tulalip Tribes. The purpose of these references apparently is to persuade the court that there also is sufficient evidence to support the Lummis usual and accustomed fishing rights in the disputed areas. However, the court fails to see that these observations are at all relevant to the interpretation of the geographic scope of Judge Boldt's findings concerning the Lummi's usual and accustomed fishing places other than to recognize that the evidence presented to Judge Boldt was necessarily sparse and inexact.

tently with the court's prior Findings of Fact, notably Nos. 10, 13, 14, 26, and 28 (384 F.Supp. 312, 352–357) and its prior legal holdings set out in 384 F.Supp. at 332 and 459 F.Supp. 1020, 1059, is sufficient to establish (subject to the limitation set out in Finding No. 382, below), that at treaty times the predecessor Indian groups to the Tulalip Tribes customarily fished in the following marine areas and that such areas were therefore usual and accustomed fishing grounds of those groups in common with other groups:

(a) Point Roberts, Birch Bay and adjacent waters now designated WDF Area 7A.

(b) The waters of the San Juan Archipelago, Haro Strait and Rosario Strait and the portion of the Strait of Juan de Fuca northeasterly of a line drawn from Trial Island (in Canada) to Protection Island.

(c) The waters of WDF Area 10.

626 F.Supp. at 1530.

However, there is no such "presumption" against subdividing Catch Reporting Areas in this litigation. Certainly, Finding 381 does not support such a conclusion. As the United States notes: "[I]n the 1974 and early subsequent Findings there was almost no reference to state catch reporting areas. Those areas were established to carry out state policies of fishery management related to current fishery management considerations, not to historical practices of treaty times. The area boundaries are changed from time to time to serve changing state needs."[4] Moreover,

the court agrees with the Requesting Tribes and the United States that resort to subdivision of Catch Reporting Areas could well result in the alteration or dilution of treaty rights whenever the State chose to alter the boundaries of the Catch Reporting Areas.

### 3. Open Marine Waters— In Common Use.

Citing Findings 363, 366, 368, 372, and 377 set forth in the Findings of Fact and Conclusions of Law In re Tulalip Tribes' Request for Determination of Usual and Accustomed Fishing Places entered by Judge Craig and reported at 626 F.Supp. at 1527–1532, the Lummi argues that the Court should find that WDF Areas 6, 6B and 6D are open marine waters subject to the presumptions of in-common use set forth in these Findings.

However, this position is outside the scope of the cross-motions for summary judgment ordered by Magistrate Weinberg. Consequently, the court makes no findings or conclusions in connection therewith.

### C. Availability of Equitable Defenses.

The issue in this portion of the motions is whether or not a tribe can be prevented by another tribe from litigating or challenging usual and accustomed fishing places by the invocation of the equitable defenses of laches, waiver or equitable estoppel.

■■■ There is no question that these equitable defenses may not be invoked by non-Indians to defeat Indian treaty rights. *Swim v. Bergland,* 696 F.2d 712, 718 (9th

---

4. The Lummis argue that the United States is taking an inconsistent position, referring the court to argument made by the United States in Sub–Proceeding No. 80–1 wherein the United States suggested the use of the Catch Reporting Areas to fix specific boundaries for usual and accustomed fishing places. However, there is a big difference between suggesting use and a presumption. While the court thinks that, administratively at least, resort to the Catch Reporting Areas makes sense, administrative convenience is not the issue here.

Cir.1983); *United States v. Ahtanum Irrigation District*, 236 F.2d 321, 328 (9th Cir.1956), *cert. denied*, 352 U.S. 988, 77 S.Ct. 386, 1 L.Ed.2d 367 (1957). As explained by the Ninth Circuit:

> The failure of the Tribes to exercise their grazing rights from 1907, when local Forest Service officials ousted them, to 1978 has no effect on the vitality of their Article IV rights. Laches or estoppel is not available to defeat Indian treaty rights ... This is true even where the Indians have long acquiesced in use by others of affected lands or have purported to grant away their occupancy and use rights without federal authorization....

696 F.2d at 718.

Noting that the treaty rights secured to the tribes include the right to an opportunity to take up to 50% of the harvestable number of fish that may be taken by all fishermen at the tribes' usual and accustomed fishing places, the Requesting Tribes argue that the ability to foreclose encroachment of a tribe into areas with respect to which that tribe has no usual and accustomed rights is part of the treaty rights enforced by the Boldt decision:

> [A] tribe need not divide and share it treaty right with another tribe who has no treaty right in an area ... [T]he right of one tribe to ensure that treaty fishing by other tribes is confined to their established usual and accustomed fishing places is <u>essential</u> to the full exercise of its own treaty fishing rights and must be considered as part of the right itself.

Moreover, the Requesting Tribes point to this court's disapproval of tribes' circumvention of the procedures set forth in Paragraph 25 the Boldt decision, 384 F.Supp. at 419, in attempting to expand usual and accustomed fishing places, *see* 459 F.Supp. at 1068–1069, as a further indication that equitable defenses are unavailable and contend:

> [A]llowing the Lummi or any other tribe to assert such claims or defenses in a subproceeding of this type would, as a practical matter, encourage disregard for this court's prior decisions. It would open the door to potentially unending litigation over the extent of various tribes' usual and accustomed fishing grounds. If equitable defenses are available to a tribe that engages in treaty fishing outside its established area, there will be a great incentive for tribes to issue regulations for areas outside their established usual and accustomed fishing grounds and to allow or encourage tribal members to engage in treaty fishing outside those areas in anticipation of being able to enlarge the tribe's treaty rights by 'prescription.' That would in turn subject this court and all parties to this lawsuit to further expenditures of time and money to resolve such disputes. Fishing regulations are issued shortly before and sometimes throughout a fishery which may only last a day or a month. Until the fish are caught and sold it is hard to know if fishermen fish out of their tribal areas. There is neither enough time nor resources to prevent a potential dilution of a tribe's treaty right by these 'equitable means' for it would mean constant court filings—most on an emergency basis. Mistakes and aggressive encroachments by one tribe on another's treaty right have been worked out non-judicially among the tribes. This cannot continue, however, if these often de minimus infractions are later used to <u>create</u> for another tribe a treaty right that never existed.

On the other hand, if equitable defenses are not available, and the court makes clear that sanctions can and will be im-

posed for willful violations of this court's rulings, each tribe will be encouraged to restrict tribal fishing to its usual and accustomed fishing grounds as determined by the court. The potential for further conflict and litigation will thus be significantly reduced, and occasional transgressions settled non-judicially among the tribes.

While the Lummi are unable to cite any authority allowing recourse to equitable defenses in actions among tribes concerning treaty rights,[5] the Lummi does argue that "[w]hile the mere passage of time does not ordinarily bar a tribal claim concerning a tribal property right, it is the loss of ability to defend which creates the laches defense." By this the Lummi means that they have been damaged by the loss of many of its elders while the Requesting Tribes sat on their rights.

■ While the court is not unsympathetic to the Lummis, the court also thinks that the law requires it to conclude that equitable defenses are not available in the determination of usual and accustomed fishing places. However, this development reinforces the court's determination that it must require the tribes which are parties to this action to finally resolve their usual and accustomed fishing places as soon as possible. This has nothing to do with equitable defenses. It has to do with the expeditious utilization of a mechanism that has been in place since the Boldt decision was issued. Otherwise, it is possible for tribes to essentially mislead other tribes and then slam the door.

ACCORDINGLY, IT IS ORDERED that the Requesting Tribes' Motion for Summary Judgment is granted and the Lummis' Motion for Summary Judgment is denied as set forth herein.

## ORDER DENYING MOTION TO REFER AND GRANTING MOTION FOR APPROVAL AND TO DISMISS SUBPROCEEDINGS

Subproceeding Nos. 81–2, and 83–9

(May 3, 1990)

After review of the pleadings filed by the moving and opposing tribes, the court denies without oral argument the Motion to Refer Quinault, Et Al., Motion for Approval of Ocean Management Agreement to Federal Magistrate filed by the Tulalip Tribes. In the court's judgment, the grounds asserted in favor of the referral by the Tulalips are speculative and are unsupported by facts or contractual provisions. Moreover, the court notes that no other tribe has joined in the Tulalip's contentions.

The court further grants without oral argument the Motion for Approval of Ocean Management Agreement and To Dismiss Subproceedings Nos. 81–2 and 83–9 filed by the Quinault Indian Nation, Hon Indian Tribe, Quileute Indian Tribe and Makah Indian Tribe. The court once again notes that the objections posed by the Tulalip's are either speculative or not supported by-reference to the terms of the Ocean Management Agreement and have not been joined by any other tribe.[1]

---

**5.** While the Lummis contend in one of their briefs that laches "can apply to a governmental agency such as an Indian tribe", none of the cases cited in support thereof involve an Indian tribe. See *Occidental Life Ins. Co. v. EEOC*, 432 U.S. 355, 97 S.Ct. 2447, 53 L.Ed.2d 402 (1977); *Jeffries v. Chicago Transit Authority*, 770 F.2d 676 (7th Cir.1985),

cert. denied, 475 U.S. 1050, 106 S.Ct. 1273, 89 L.Ed.2d 581 (1986); *Cannon v. University of Health Sciences*, 710 F.2d 351 (7th Cir.1983).

**1.** Although the respective moving parties requested oral argument in connection with their motions, the court does not feel that oral argument will be helpful.

ACCORDINGLY, IT IS ORDERED that the Tulalip's Motion to Refer Quinault, Et Al., Motion for Approval of Ocean Management Agreement to Federal Magistrate is denied.

IT IS FURTHER ORDERED that the Motion for Approval of Ocean Management Agreement and To Dismiss Subproceedings Nos. 81–2 and 83–9 is granted and that Subproceedings Nos. 81–2 and 83–9 are dismissed without prejudice and that judgment is to be entered.

## DECISION AND ORDER RE EASTERN BOUNDARY OF LUMMI INDIAN RESERVATION

### Subproceeding No. 86–7

### (May 26, 1990)

On August 26, 1987 the United States Magistrate issued his Report and Recommendation on Boundary of Lummi Indian Reservation wherein he recommended in pertinent part that the court find that the eastern boundary of the Lummi Indian Reservation be deemed to proceed along the low water mark around Portage Island and, following the meanderings of the shore, to a point due south of Treaty Rock; then due north to Treaty Rock.

The court has received and considered the objections to the Report and Recommendation filed by the Lummis and joined by the United States, the Hoh, Quileute, Nisqually, Squaxin, Nooksack, Saux–Suiattle, Upper Skagit, Swinomish, Stillaguamish, Muckleshoot, Squaxin Island, Skokomish, Suquamish, Port Gamble Klallum, Jamestown Klallam, Lower Klallam, Quinault Nation, and Tulalip Tribes, as well as the separate briefs filed in support of their objections by the United States and the Tulalips and in opposition to these objections by the State of Washington. In reviewing and considering these objections, the court has been governed by the standards set forth in Rule 72(b), Federal Rules of Civil Procedure and 28 U.S.C. § 636(b)(1)(B) and has conducted a de novo review where required to do so.

Upon due consideration of the record herein, the objections of the parties, and their respective briefs, the court issues the findings of fact and conclusions of law set forth herein. In so ruling, the court concurs in the Magistrate's ultimate conclusion, making certain modifications to the Report and Recommendation.

### FINDINGS OF FACT

1. Issac Ingalls Stevens, Governor of Washington Territory, met with representatives of many Western Washington tribes, including the predecessors of the Lummis, in 1854 at "Point Elliot," or Mukilteo. They negotiated an agreement on the creation of a reservation for the Lummis.

2. The Treaty of Point Elliot ("the Treaty"), executed January 22, 1855, (Exh. F–137) memorialized that agreement. The Treaty described the area set aside for the Lummis as:

"... the island called Chah-choo-sen, situated in the Lummi River at the point of separation at the mouths emptying respectively into Bellingham Bay and the Gulf of Georgia." (Exh. F–137, p. 2).

Exh. F–151 illustrates this 'island' most clearly. The description in the Treaty did not allude in any way to bedlands, under Bellingham Bay or elsewhere.

3. Members of the Lummi Tribe have testified at various times that it has been their understanding that the eastern boundary of the reservation is a line from Treaty Rock to Point Francis. In *United States v. Romaine*, 255 F. 253 (1919), one tribal member testified he had participated in negotiation of the treaty with Governor

Stevens; and, "that it was always understood that ... the eastern boundary line would be from Point Francis to Treaty Rock." (Exh. L–13, p. 37). Other tribal members testified in *Romaine* that they had been told by persons present during the negotiations that this was to be the boundary. All conversations between the Lummis and Governor Stevens were translated in two phases: from English into Chinook jargon, and then into the Lummi language. Samuel Cagey, a tribal member, testified in this sub-proceeding that he had been told that Governor Stevens motioned with his arms that the line would run from Treaty Rock to Point Francis.

4. A map prepared by the Surveyor General in 1859 (Exh. F–152) depicts all Indian reservations in the area. It includes no portion of Bellingham Bay within the Lummi Reservation.

5. Indian Agent M.T. Simmons proposed certain changes in the northern boundaries of the reservation in a letter dated December 13, 1859 (Exh. F–138).[1] The purpose of the proposed changes was to avoid the expense of a survey. The changes proposed by Simmons are clearly illustrated on Exh. F–154. The boundary description proposed by Simmons, insofar as it related to the shorelines of the reservation, began on the Gulf of Georgia, where it intersected with the north boundary of township No. 38 North, Range 2 East. Simmons' description continued:

"... thence following the meanderings of the shore in townships No. 37 & 38 North Ranges No. 1 and No. 2 East to the place of beginning [Treaty Rock]."

Exh. F–138. This description contains no bedlands. There is no suggestion in Simmons' letter that he was proposing any change in the boundary of the reservation along Bellingham Bay.

6. C.C. Finkbonner, the then "Farmer–in–Charge" of the Lummi Reservation, submitted his fifth annual report to the Bureau of Indian Affairs in July, 1867. (Exh. F–146). The report states that the reservation is located on Bellingham Bay and is an island sufficiently isolated to prevent the encroachment of white settlers. The report then sets forth a legal description of the boundaries of the reservation, which legal description coincides with the legal description of the boundaries proposed by Simmons in 1859. The report describes the reservation as being eight miles long and two to four miles wide, containing an area of from 15,000 to 20,000 acres of land.

7. Correspondence received by the Commissioner of Indian Affairs during 1873 (Exhs. F–139, F–140, and F–141) reflects that the official survey, performed in 1860, had incorporated the boundary changes proposed by Agent Simmons. Some of the land excluded by those changes from the original reservation had then been sold to non-Indians. The 1873 correspondence questioned the validity of the boundary changes and the sales to non-Indians.

8. President Ulysses S. Grant issued an Executive Order on November 22, 1873, (Exhs. F–151 and F–155), establishing the Lummi Reservation, defined by the following legal description:

"Commencing at the eastern mouth of Lummi River thence up said river to the point whence it is intersected by the line between sections seven and eight of township thirty-eight North range two east of the Willamette Meridian thence due North on said Section line to the township line between townships thirty-eight and thirty-nine thence west along such township line to low-water mark on

---

1. These changes are not in question in this sub-proceeding.

the shore of the Gulf of Georgia thence Southerly and easterly along the said shore with the meanders thereof across the western mouth of Lummi river and around Point Francis thence northeasterly to the place of beginning.—So much thereof as lies south of the west Fork of the Lummi river being a part of the island already set apart by the second article of the treaty with the Dwamish and other allied tribes of Indians, made and concluded January 22, 1857 [sic] [Stats at Large Vol. 12 p. 928](s) U.S. Grant."

(Exh. F–151). The punctuation in the foregoing reflects that in Exh. F–151, which is a handwritten copy of the original. Exh. F–155 is a different handwritten copy, and is considerably less legible.[2]

9. The State of Washington was admitted to the United States on November 11, 1889.

10. In *United States v. Romaine, supra*, the Ninth Circuit ruled that, at the time the Treaty was signed, the mouth of the east fork of the Lummi River[3] was a point called "Treaty Rock." The Ninth Circuit held, therefore, that Treaty Rock is the point of beginning for the legal description defining the Lummi Reservation. That decision remains binding upon the parties and upon this court.

11. General Land Office Surveyors placed a brass cap of Treaty Rock in 1930 (Exhs. L–15 and L–17). Although the rock has since been covered with silt, it remains in place. Treaty Rock is above or closer to shore than the low water mark.

12. With one possible exception, no map of the reservation introduced into evidence shows a boundary which includes a straight line from the general area of Point Francis to Treaty Rock. The possible exception is Exhibit L–14, which is a copy of Exhibit 4 in *United States v. Romaine.* That exhibit shows a dashed line, but without any label. It is unknown who drew the line, or what it was intended to represent.

13. "Point Francis" is not a clearly defined location. The maps of the area are in direct conflict on this point. Exhs. F–151, F–154 and F–155 show it as the easternmost portion of Portage Island. Exh. L–14 and F–165 show it as the southernmost portion. Exhs. F–150, F–147, F–156, and F–164 show it as some location between those two. Exhs. F–148 and F–149 show it as a long sweep along the southern coast of Portage Island. Exh. F–162 shows it as the lower part of the Lummi peninsula, the upper part of Portage Island, and the portage area between. Exh. F–163 shows it as a long sweep along the eastern shore of Portage Island. The description in Exh. F–159, a portion of the "U.S. Coast Pilot" for 1889, equates "Point Frances" with all of Portage Island.

14. The expert surveyor who testified on behalf of the State testified that the legal description in the Executive Order is not really susceptible to two interpretations. It was very clear to him that the eastern boundary followed the low water mark. By contrast, the expert surveyor who testified on behalf of the Lummis could testify only that he would be "hard pressed" to judge which would be the better reading of the description. No surveyor testified that under the proper reading of the description the eastern boundary

---

2. Exh. F–151 is a certified copy of the document in the Seattle branch of the National Archives. Exh. F–155 is a certified copy of the document lodged in the National Archives in Washington, D.C.

3. The east fork of the Lummi River was later called the Nooksack River.

was a straight line between the Point Francis area and Treaty Rock. The expert surveyor who testified on behalf of the State had prepared more thoroughly, and was more persuasive, than the expert surveyor on behalf of the Lummis.

## CONCLUSIONS OF LAW

 1. Principles governing treaty construction apply equally to the construction of an executive order based upon a treaty. *Puyallup Indian Tribe v. Port of Tacoma*, 717 F.2d 1251, 1257 n. 6 (9th Cir.1983), *cert. denied sub nom. Trans–Canada Enterprises, Ltd. v. Muckleshoot Indian Tribe*, 465 U.S. 1049, 104 S.Ct. 1324, 79 L.Ed.2d 720 (1984). It is held in *Washington v. Washington State Commercial Fishing Vessel Ass'n*, 443 U.S. 658, 675–676, 99 S.Ct. 3055, 61 L.Ed.2d 823 (1979):

> [I]t is the intention of the parties, and not solely that of the superior side, that must control any attempt to interpret the treaties. When Indians are involved, this Court has long given special meaning to this rule. It has held that the United States, as the party with the presumptively superior negotiating skills, and superior knowledge of the language in which the treaty is recorded, has a responsibility to avoid taking advantage of the other side. '[T]he treaty must therefore be construed, not according to the technical meaning of its words to learned lawyers, but in the sense in which they would naturally be interpreted by the Indians.' [citations omitted]

Treaties with Indians and statutes passed for the benefit of Indians are to be liberally construed, doubtful expressions being resolved in favor of the Indians. *Choctaw Nation v. Oklahoma*, 397 U.S. 620, 630–631, 90 S.Ct. 1328, 25 L.Ed.2d 615 (1970); *Alaska Pacific Fisheries v. United States*, 248 U.S. 78, 79, 39 S.Ct. 40, 63 L.Ed. 138

(1918). However, while the rule by which legal ambiguities are resolved to the benefit of the Indians is given the broadest possible scoped, the Supreme Court in *De Coteau v. District County Court*, 420 U.S. 425, 447, 95 S.Ct. 1082, 43 L.Ed.2d 300 (1975), cautioned: "[I]t remains at base a canon for construing the complex treaties, statutes, and contracts which define the status of Indian tribes. A canon of construction is not a license to disregard clear expressions of tribal and congressional intent." Therefore, the fact that the legal description in the Executive Order is ambiguous does not ipso facto entitle the Lummis to the most favorable conceivable interpretation when all of the other evidence strongly supports the selection of the low water mark as the eastern boundary.

2. The natural and logical reading of the legal description in the Executive Order leads to the conclusion that the eastern boundary of the reservation follows the low water mark, just as the western boundary does. This conclusion is reinforced by the fact that no map of the reservation ever depicted any portion of Bellingham Bay as within its boundaries with the possible exception of Exh. L–14. It is further supported by the fact that "Point Francis" is not a clearly defined location from which a straight line could be drawn. Finally, it is reinforced by the fact that the legal description prescribes that the boundary proceeds "around" Point Francis, not "to" Point Francis.

3. The description calls for the boundary to proceed northeasterly to Treaty Rock. In light of the entire description, this does not require a boundary that runs in a precise northeasterly direction. Nor does it require a straight line boundary at all. The prior portion of the description calls for the boundary, from its first intersection with the Gulf of Georgia, to follow

the shore southerly and easterly around Point Francis. As Exh. F–151 demonstrates, such a line at times runs not only south and east, but also north, northwest, southwest, northeast, etc. Consistent with the description, however, the Point Francis area is generally southerly and easterly from the intersection with the Gulf of Georgia. Similarly, Treaty Rock is generally northeasterly from the Point Francis area.

4. The description in the Treaty limited the reservation to certain land areas. It does not include any portion of Bellingham Bay. The description in the Treaty is unambiguous in this respect.

5. The legal description in the Executive Order changed somewhat the description in the Treaty. But evidence of the surrounding circumstances establishes that these changes were made to resolve confusion and potential problems as to lands at the northern end of the reservation. By contrast, there is no evidence that the Executive Order was intended to change the eastern boundary in any way, or that there was any impetus for such a change.

6. The parties agree that the legal description in the Executive Order entered in 1873 governs this dispute. The evidence from tribal members as to what Governor Stevens said at Mukilteo in 1854, nineteen years earlier, has little, if any, relevance to the interpretation of that legal description. For several reasons, this evidence would be of only limited value even in determining the boundary established by the Treaty. First, the description in the Treaty, which is the contemporaneous written record, is clear and unambiguous. Secondly, Governor Stevens' words at Mukilteo were translated in two stages before they could be understood by the tribal members present. Third, given the passage of 133 years, almost all of the accounts in this court from tribal members as to the negotiations are necessarily several times removed from the original witnesses. Finally, the interest of tribal members in exclusive fishing rights in the contested waters must be considered in evaluating their testimony. The Lummis have not established that a boundary at the low water mark deprives them of any rights which they had retained in signing the Treaty.

7. There have been two prior adjudications relating to the boundary of the Lummi reservation. While each case provides some support for one of the parties here, in neither case did the holding address the issue in this case. In *United States v. Romaine, supra,* the Ninth Circuit held that Treaty Rock was the point of beginning. While the court referred to the testimony of tribal members that Governor Stevens had indicated a straight line boundary, 255 F. at 256–257, 259–260, this issue was not necessary to the decision and the Ninth Circuit did not resolve it. In *United States v. Stotts,* 49 F.2d 619 (W.D.Wash.1930), this court held that the reservation included the tidelands. The holding in *Stotts* is consistent with both of the interpretations urged in this sub-proceeding. Insofar as it appears, *Stotts* was not presented with the contention that the eastern boundary is a straight line. *Stotts* did state that the boundary established by the Executive Order followed the low water line from the Gulf of Georgia to the point of beginning at the eastern mouth of the Lummi River. 49 F.2d at 620. But *Stotts* cites *Romaine* for this proposition, and *Romaine* does not so hold, at least as to the eastern boundary. More importantly, the issues in *Stotts* required no choice between a boundary along the low water mark and a straight line eastern boundary.

8. Defining the boundary as the low water mark results in a problem in "clos-

ing" the boundary at the point of beginning, Treaty Rock, which is not along the low water mark. The expert surveyor on behalf of the State proposed that the boundary be closed by a line running due north from the low water mark to Treaty Rock. This solution is a reasonable one, and is fair to the Lummis. It is most clearly illustrated on Exh. L–25.

9. The eastern boundary of the Lummi Indian Reservation is deemed to proceed along the low water mark around Portage Island and, following the meanderings of the shore, to a point due south of Treaty Rock; then due north to Treaty Rock.

## ORDER

1. The eastern boundary of the Lummi Indian Reservation is deemed to proceed along the low water mark around Portage Island and, following the meanderings of the shore, to a point due south of Treaty Rock; then due north to Treaty Rock.

2. The fishing rights and the other rights of all parties shall be governed by this ruling effective as of the date of filing of this Decision and Order re Eastern Boundary of Lummi Indian Reservation.

3. This sub-proceeding is remanded to United States Magistrate John L. Weinberg for further proceedings relating to the claims by the State of Washington to equitable adjustment of future catches.

IT IS SO ORDERED.

## ORDER DENYING QUILEUTE TRIBE'S MOTION FOR TEMPORARY RESTRAINING ORDER

Subproceeding No. 90–2

(November 3, 1990)

On October 31, 1990, the court heard the Quileute Tribe's Motion for Temporary Restraining Order re Outplant-

ing of Quillayute Spring Chinook. Upon due consideration of the written and oral arguments of the parties and the record herein, the court denies this motion for the reasons set forth herein.

The court is persuaded that the Tribe has shown neither likelihood of success on the merits nor irreparable injury. The court agrees with the State that unless a transfer violates agreed management goals, the eggs can be transferred to another river system absent an agreement to the contrary. Here, no such agreement against transfer can be inferred from the contractual provisions relied upon by the Tribe. Moreover, in the court's opinion, such, an implied agreement would make no sense given the contractual establishment of specific management goals. In any event, a provision of such asserted importance to the Tribe would be specifically covered in any agreement. The court is satisfied from the arguments of the parties that there is little, if any, risk of spread of disease because of the transfer of the eggs, especially given the State's representation that the eggs to be transferred have been inspected specifically for the viruses by the appropriate authorities.

Consequently, it is ordered that the Quileute Tribe's Motion for Temporary Restraining Order re Outplanting of Quillayute Spring Chinook is denied.